# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT, DECEMBER TERM, 1832.

[ PHILADELPHIA, JANUARY 8, 1833.]

The President, Managers and Company for erecting a BRIDGE over the RIVER LEHIGH, near the town of Northampton *against* The LEHIGH COAL AND NAVIGATION COMPANY.

APPEAL.

4r 9
178 510
Rawle.
4r 9
191 181

4 R 9
J 24 SC 1441

The act of assembly of the 20th of *March*, 1818, "to improve the navigation of the river *Lehigh*," and that of the 13th of *February*, 1822, "to incorporate the *Lehigh* Coal and Navigation Company," in whom the rights, &c. of the grantees under the former act became vested, in providing a remedy for injuries occasioned by the construction of the works, provide for nothing that was not remediable at common law, and, on the other hand, the statutory remedy extends to every common law injury.

A corporation (such as a bridge company), though not within the letter of the acts, is within their equity, and may recover damages in the mode prescribed by them, for injuries sustained in its property.

If a corporation omit to continue the succession to certain offices which constitute an integral part of its body, but these offices be supplied with officers *de facto*, it is sufficient to sustain its existence as to strangers, and to enable it to maintain a suit.

The loss of an integral part of a corporation, works a dissolution to certain purposes only; the corporate franchise being suspended, but not extinguished. An entire dissolution is the result of a permanent incapacity to restore the deficient part, and never happens where the legitimate existence of the part is not indispensable to a valid election, or other means of reproduction.

A forfeiture of the charter of a corporation for abuse or neglect of its franchise, must be declared by process and judgment of law, before the corporation can be treated as defunct.

The existence of a corporation plaintiff, can be put in issue only by a plea in abatement, or, at least, by such a plea as denies the whole declaration; pleading over specially to the merits, admits the plaintiff's capacity to sue.

(Lehigh Bridge Company *v.* Lehigh Coal and Navigation Company.)

The legislative grantees of a right to improve the navigation of a river, by erecting dams, locks, &c., with the privilege of entering upon the lands of others for those purposes, have the same right to erect a dam at any place on the river, that a proprietor has to erect one on his own lands; and if chargeable with no want of attention to its probable effect, are not answerable for consequences which it was impossible to foresee and prevent.

For an act of Providence, alone, therefore, they are not answerable. To fix them with liability for mischief done by a flood or storm, there must be a concurrence of negligence with the act of Providence; and in a proceeding against them to recover damages for such mischief, it is for the jury to inquire whether they have used all proper precautions to prevent consequential injury.

In a proceeding to recover damages for an injury done to the pier of a bridge, occasioned by the erection of a dam with a sluice or chasm left for rafts, which in a flood directed the volume of water against the pier, the standard of damages is not the cost of a new pier, unless the old one should be found altogether worthless.

THIS case, which came before the court on an appeal from the judgment of the Circuit Court of *Lehigh* County, held by HUSTON J., in *April*, 1832, originated in a petition presented by the plaintiffs, to the Court of Common Pleas of *Lehigh* County, on the 11th of *September*, 1830, for a *venire* under the acts of assembly of 20th of *March*, 1818, entitled " An act to improve the navigation of the river *Lehigh*" (*Pam. Laws*, 197,) and of 13th *February*, 1822, entitled " An act to incorporate the *Lehigh* Coal and Navigation Company," (*Pam. Laws*, 21.)

The plaintiffs were incorporated by the act of 28th of *March*, 1797, entitled, " An act to authorise the governor of the commonwealth to incorporate a company for erecting a bridge over the river *Lehigh*, near the town of *Northampton*." (5 *Laws of Penn*. 242. *Carey and Bioren's* ed.)

By the *first* section of this act, commissioners are named for receiving subscriptions; the form of subscription indicated, and five dollars on each share directed to be paid on subscribing. The *second* section declares, that when fifteen or more persons shall have subscribed one hundred shares, the governor shall incorporate the company; directs what the style of the corporation shall be; authorises an enlargement of the capital stock, &c. By the *third* section, the six persons first named in the letters patent, are directed to give notice in two or more *Philadelphia* newspapers, one of which shall be in the German language, and also in the public newspapers at *Easton*, of a time and place by them to be appointed, not less than thirty days from the time of issuing the first notice, when and where the subscribers shall proceed to organise the corporation, by choosing " one president, four managers, one treasurer, and such other officers as they shall think necessary to conduct the business of the corporation for one year, and until other officers shall be chosen, and are authorised to make such by-laws, rules, &c., as may be necessary for the well ordering the affairs of the company," &c. By the *fourth* section it is provided, that the stockholders shall meet on the first *Monday* in *August* in every succeeding year, for the purpose of choosing such officers as aforesaid for the ensuing year. The *fifth*, *sixth* and *seventh* sections are not material. The *eighth* directs the mode of keeping the ac-

counts of the company, which are to be submitted once a year to the stockholders until the bridge shall be completed, and until all the cost, charges and expenses, shall be fully paid and discharged; it directs that the aggregate amount of all such expenses shall be liquidated and ascertained, and if upon such liquidation, or whenever the whole capital stock shall be nearly expended, it shall be found that the capital stock is not sufficient to complete the bridge, the president, managers and company are authorised to increase the number of shares to such extent as shall be deemed sufficient to accomplish the work.   The *ninth* section vests the property of the bridge, when completed, in the company; establishes the rate of tolls, and contains a *proviso*, that the bridge shall not be erected in such a manner as to injure, stop, or interrupt, the navigation of the river or the passage over the ford near to the place where the ferry was then kept.   The *tenth* and *eleventh* sections are immaterial. The *twelfth* directs, that accounts shall be kept of the tolls received, and that dividends shall be declared, deducting first, expenses, and such a sum as may be deemed necessary for a growing fund to provide against the decay of the bridge, and for rebuilding and repairing it.   The *thirteenth* section provides that at the end of every third year from the date of the incorporation, until two years next after the bridge shall be completed, an abstract of the accounts, showing the whole of the capital expended in the prosecution of the work, and the income and profit arising from the bridge, during those periods, shall be laid before the legislature, with an exact account of the cost and charges of keeping the bridge in repair, to the end that the clear income may be ascertained, and if it shall appear that the clear income and profits will not bear a dividend of six per cent, the tolls shall be increased so as to raise it to that amount, and at the end of every ten years after the completion of the bridge, a like abstract shall be laid before the legislature, and if the clear income and profits will bear a dividend of more than fifteen per cent, the tolls shall be reduced so as to reduce the dividend to fifteen per cent.   The *fourteenth* section provides, that if the company shall not proceed to carry on the work within three years after their incorporation, and shall not complete it within seven years from the passage of the act, the legislature may resume the grant.   And the *fifteenth* section authorises the legislature, after the year 1820, to take the bridge at a valuation.

This act was revived and amended by an act passed 28th of *March,* 1806, (4 *Sm. L.* 341.)

On the 20th of *March,* 1818, an act of assembly was passed, entitled, "An act to improve the navigation of the river *Lehigh*," (7 *Laws of Penn., Read's* ed. 86,) by which *Josiah White, George F. A. Hauto,* and *Erskine Hazard,* their heirs and assigns, were authorised to enter upon the said river, to open, enlarge and change its channel, &c., to make dams, locks, or any other device which they should think fit and convenient to make a good navigation down-

(Lehigh Bridge Company *v.* Lehigh Coal and Navigation Company.)

ward, &c. The *second* section of this act provides, " that if any person or persons shall be injured by means of any dam or dams being erected, or the land of any person inundated by swelling the water by means of any dam or dams, or any mill or other water works injured by swelling the water into the tail race of any mill, or other water works, which may have been erected in the said river, and if the said *Josiah White, George F. A. Hauto,* and *Erskine Hazard,* their heirs and assigns, cannot agree with the owner or owners thereof, on the compensation to be paid for such injury, the same proceedings shall be had as are provided in the *third* section of this act; the persons valuing the damages, being first sworn or affirmed, or the jury, as the case may be, shall take into consideration the advantages which may be derived by such owner or owners by the navigation aforesaid."

The *third* section declares, " That the said *Josiah White, George F. A. Hauto,* and *Erskine Hazard,* their heirs and assigns, shall have authority and power by themselves or their superintendants, engineers, artists and workmen, to enter in and upon, and occupy, for the purpose, all land which shall be necessary and suitable for erecting a lock, sluice, canal, tow-path or other device, doing as little damage as possible, and there to dig, construct, make and erect, such lock, sluice, canal, tow-path, or other device, satisfying the owner or owners thereof, but if the parties cannot agree upon the compensation to be made to such owner or owners, it shall and may be lawful for the parties to appoint six suitable and judicious persons, who shall be under oath or affirmation, and who shall reside within the proper county where the land lies; or if they cannot agree on such persons, then either of the parties may apply to the Court of Common Pleas of the proper county where the land lies, and the said court shall award a *venire* directed to the sheriff, to summon a jury of disinterested men, in order to ascertain and report to the court what damages, if any, have been sustained by the owner or owners of the ground by reason of such lock, canal, sluice, tow-path, or other device, passing through his, her or their land, which report being confirmed by the court, judgment shall be entered, and execution shall issue, in case of non-payment, for the sum awarded, with reasonable cost to be assessed by the court. And it shall be the duty of the jury, or the six appraisers, as the case may be, in valuing any land, to take into consideration the advantage derived to the owner or owners of the premises from the said navigation : *Provided,* that either party may appeal to the court within thirty days after such report may have been filed in the prothonotary's office of the proper county, in the same manner as appeals allowed in other cases." This section also contains a provision in relation to *femmes covertes,* persons under age, *non compotes mentis,* or out of the state.

On the 13th of *February,* 1822, an act of assembly was passed, (*Pam. Laws,* 21,) to incorporate " The *Lehigh* Coal and Navigation

Company," the preamble of which recited the act of 20th *March,* 1818, to " improve the Navigation of the river *Lehigh,*" by which certain rights were granted to Messrs. *White, Hauto* and *Hazard :* That they had conveyed to the *Lehigh* Navigation Company, all the rights vested in them by that act, reserving certain residuary profits: That Messrs. *White, Hauto* and *Hazard,* had purchased certain estate in sundry tracts of coal land, which for the purpose of raising funds, they had conveyed to trustees for the use of certain persons furnishing the funds, and associated under the name of " The *Lehigh* Coal Company," reserving certain residuary profits and exclusive rights in the management of the company : That these companies had united and amalgamated themselves into one company, under the name of The *Lehigh* Navigation and Coal Company, confirming to Messrs. *White, Hauto* and *Hazard,* the residuary profits, and exclusive rights before reserved by them : That *Hauto* had agreed to convey all his rights to *White* and *Hazard,* which agreement had been carried into effect, and the funds of the company being still insufficient for the objects of the association, it was agreed between the stock-holders in the said company, and the said *White* and *Hazard,* that the name of the company should be changed to that of " The *Lehigh* Coal and Navigation Company :" That the capital stock should be increased by the admission of new subscribers, and that in consideration thereof, and certain shares of the stock of the new company to be given to them, *White* and *Hazard* should release to the company their reserved rights, and convey to trustees, in the new company, all their right to the water power, and come in as simple stockholders under the new association, &c.    The act, therefore, in the *first* section, incorporates the new company, by the name of " The *Lehigh* Coal and Navigation Company," with the usual corporate powers, &c.    The *second* section, vests the property of the former association in the new corporation, and provides that its contracts shall continue in force.    The *third* section confirms to the corporation the rights and privileges granted to Messrs. *White, Hauto* and *Hazard,* by the act of 20th of *March,* 1818.    The *seventh* section, declares, that in the appraisement of damages, and valuation of materials provided for by the *second, third, fourth, fifth,* or any other sections of the above mentioned act, if either party shall require it, the referees, or persons composing the jury of valuation, shall not be taken from within seven miles of the river *Lehigh.*

The petition presented by the plaintiffs to the Court of Common Pleas, in pursuance of the provisions of these acts of assembly, alleged damage and injury to their property, in the following particulars, viz.

*First.*    By the erection and construction of the defendants' dam, it was alleged that the middle pier of the bridge was undermined, and the foundation of it cracked and split, and totally ruined, and the value of the bridge impaired to the amount of ten thousand dollars.

(Lehigh Bridge Company *v.* Lehigh Coal and Navigation Company.)

*Second.* That by reason of the blasting of rocks, earth and stone, in the construction of the canal, &c., above and below the bridge, a house erected on the bridge, of the value of five hundred dollars, was shattered, torn in pieces, prostrated, and totally destroyed.

*Third.* That by reason of the blasting of rocks, stones and earth, as aforesaid, a large and substantial iron chain was severed and broken, and the frame and wood work of the bridge seriously injured, thereby further impairing the property of the plaintiffs' to the value of five hundred dollars.

*Fourth.* That certain scaffolding made use of in repairing the bridge, was prostrated, swept away, and totally destroyed, thereby further impairing the value of the plaintiffs' property to the amount of two hundred dollars.

*Fifth.* That by reason of the construction of the dam across the river, &c., a large quantity of stone and gravel was forced down the river which has seriously injured the property of the plaintiffs.

*Sixth.* That the plaintiffs being seized in their demesne as of fee of a certain tract of land, &c. in *Hanover* township, &c., containing fifty feet square, the defendants had, in constructing their lock and tow-path, fifty feet in length, and thirty-seven feet in width, upon and through this land, deprived the plaintiffs of the use and occupation of the land, and impaired the value of their property to the further amount of one hundred dollars. And other wrongs and injuries, &c. That the defendants had made no compensation, &c.

By virtue of this *venire* the sheriff summoned an inquest, who on the 18th of *October*, 1830, returned an inquisition finding that damages to the amount of six thousand three hundred and seventy-one dollars, had been sustained by the plaintiffs, " exclusive of any advantages which may be derived to the said, ' The President, Managers and Company, for erecting a bridge,' &c., from the navigation of the said river *Lehigh*, improved by the said, ' The *Lehigh* Coal and Navigation Company,'" and accordingly assessed the damages at that sum.

From this finding the defendants appealed to the Court of Common Pleas of *Lehigh* County, and afterwards removed the cause into the Circuit Court.

The plaint filed by the plaintiffs, set forth, in substance, that by virtue of the act of 28th of *March*, 1797, and that of 28th of *March*, 1806, the plaintiffs were incorporated by the corporate style aforesaid, and in and during the years 1813, 1814, and 1815, erected and constructed a good and substantial bridge composed partly of stone, partly of wood, and partly of iron, called a chain bridge : That the right, title, property and interest in the bridge, with the right of taking toll, were, and ever since have been, and now are, absolutely vested by the provisions of those acts of assembly, in the plaintiffs, their successors, and assigns, forever : That between the 1st of *January*, and 20th of *June*, 1829, the defendants constructed a dam across the river, leaving a sluice, or passage, in the dam, which threw

the water along the east side of the middle pier of the bridge, by which the pier was undermined, the foundation of it sunk, and the pier itself cracked and split and totally ruined, by reason whereof the value of the bridge was impaired to the amount of ten thousand dollars: That the defendants, by blasting, and blowing rocks, earth and stone, in the construction of a certain canal, lock, tow-path, and other devices at, above, and below, the east end of the bridge, on the 21st of *October*, 1828, severed and broke down a large and substantial iron chain, in consequence of which the floor of the bridge was thrown down, and the frame and wood work, greatly injured, by which the plaintiffs sustained damage to the amount of five hundred dollars: That by reason of the same causes, a frame house on the eastern pier of the bridge was torn in pieces, prostrated, and totally destroyed, to the further damage of the plaintiffs five hundred dollars; and that by the occupation by the defendants of the plaintiffs' land for a lock and tow-path, they had sustained further damage to the amount of five hundred dollars.

The defendants pleaded that they had not committed the damage complained of, upon which issue was joined.

On the opening of the case to the jury, the plaintiffs' counsel claimed damages, 1st, For the undermining of the pier; 2d, For the land occupied by the canal and tow-path; 3d, For the shattering of the bridge by blasting stone in the canal; 4th, For the loss of scaffolding; and lastly, for the loss of tolls.

After having given in evidence the act of 28th of *March*, 1797, authorising the incorporation of the Bridge Company, the supplementary act of 28th of *March*, 1806, and the charter of incorporation, dated 12th of *March*, 1812, and shown title to the piece of ground, fifty feet square, already mentioned, the plaintiffs' counsel called a witness, who was sworn, but before he was examined the defendants' counsel objected to any further evidence being given, until it should be shown, by proof of the election of officers held according to law, that the corporation was still in existence. The witness was then withdrawn, and the book of minutes of the company produced, from which it appeared, that on the 16th of *May*, 1812, an election was held, when *James Greenleaf* was elected President, *Jacob Clader*, *John Mohr*, *John Kerper* and *Jacob Newhard*, Managers, and *George Graff* Treasurer; and that on the 13th of *June* of the same year, by-laws were passed. No minute appeared in the book of any meeting from the 30th of *July*, 1813, to the 1st of *September*, 1814. On the last mentioned day, *James Jameson*, President, *Jacob Newhard*, *Jacob Clader*, *Christian Young* and *Abraham Smith*, Managers, met, &c.

The plaintiffs' counsel then read the act of 23d of *April*, 1829, (*Pam. L.* 320,) authorising the stockholders of the Bridge Company to meet and fill all vacancies which then were, or which might thereafter be caused, by the death or resignation of the officers or managers of the company, or from any other cause whatever, and providing that at least two weeks notice of the time, place, and purpose of such meet-

ing, should be published by the direction of some officer, or at least three stockholders of the company, in one or more of the newspapers printed in the borough of *Northampton,* and also that the special elections to be held under the provisions of this act, should, in other respects, be conducted in the manner that the annual elections of the company were by law directed to be conducted.

From the minutes it appeared that elections for officers took place on the 3rd of *August,* 1829 ; on the 3rd of *August,* 1830, and on the 18th of *April,* 1831. No election was held on the 3rd of *August,* 1831.

The defendants' counsel still objected to any evidence being given in the cause, until it was shown that the officers of the corporation had been regularly elected.

His HONOUR declared, that he would let the cause go on, though he entertained strong doubts on the subject. At the request of the defendants' counsel, he noted the decision.

The plaintiffs' counsel then showed entries in the book of minutes, of elections in several years, and also loose papers purporting to be certificates of other elections, not recorded or entered in the minute book, a list of which was furnished to the court ; but they were objected to as evidence until they should be proved.

A number of witnesses was examined on behalf both of the plaintiffs and defendants, in relation to the injuries complained of by the plaintiffs. Their statements as to the nature, causes, and extent of these injuries (to insert which would occupy too much space), differed materially from each other.

His HONOUR left the *quantum* of damages to the jury as a question of fact, giving it as his opinion, that the plaintiffs were entitled to recover damages to the extent of the injury sustained, but intimating, that, from the whole evidence, the amount did not appear so great as the plaintiffs alleged; and instructing the jury, that they ought not to take into consideration any advantages which the plaintiffs might have derived from increased tolls in consequence of the increase of business occasioned by the works of the defendants.

The jury on the 19th of *April,* 1832, returned a verdict in favour of the plaintiffs, for five thousand seven hundred dollars.

A motion was made for a new trial, which being overruled, the defendants appealed.

The following were the reasons assigned for a new trial, *viz.*

*First.* That the injuries sustained were not remediable by the proceedings instituted.

*Second.* That there was no proof of the existence of such a corporation as the plaintiffs' at the time the alleged injuries are said to have been committed.

*Third.* That a corporation cannot institute such a proceeding as the present against the defendants.

*Fourth.* That the verdict is contrary to law, the evidence in the

cause, and the charge of the court, as to the *quantum* of damage, or extent of the injury for which damages could be recovered.

*Fifth.* That the judge erred in so much of his charge as excluded from the consideration of the jury, the advantages derived by the plaintiffs, from the works of the defendants.

*Davis* and *J. M. Porter,* for the appellants,—after adverting to the second section of the act of 20th of *March,* 1818, " to improve the navigation of the river *Lehigh,*" which provides a remedy for injuries occasioned by dams erected by the defendants, contended—

1. That the case of the plaintiffs did not come within the perview of that act; but that if the injuries complained of really had been sustained, the remedy for part of them, at least, was at common law.   On the trial, claims for damages of two kinds were submitted to the jury ; one founded upon the alleged injuries to the pier; the other upon the occupation of the plaintiffs' land, for a canal and tow-path.   The first is clearly not embraced by the act referred to, which provides a remedy for damages done to *land, mills or other water works,* by the swelling of the water of the river.   A bridge, it will not be pretended, comes within the description of a mill, or other water works.   Nor is it *land,* or taxable as such for raising county rates and levies.   *Permanent Bridge Company* v. *Frailey,* 13 *Serg. & Rawle,* 422.   The alleged injury, moreover, was not the direct and immediate consequence of the works of the defendants. The injury is ascribed to a sluice left in the dam and an unusually high freshet, caused by heavy rains, which produced an extraordinary flood of water through it, in consequence of which the pier was undermined and cracked.   Ordinary freshets had done no injury, but the extraordinary one of *December,* 1829, produced the mischief. These facts present a case of consequential damage, for which at common law the remedy would be an action on the case.   The act of assembly was intended to provide a remedy only for those injuries which were the necessary and immediate result of the construction of the works of the defendants, leaving it to the common law to redress all injuries which were not embraced by the statute.   *Shrunk* v. *The Schuylkill Navigation Company,* 14 *Serg. & Rawle,* 71, 83. *Chesnut Hill and Spring House Turnpike Company* v. *Rutter,* 4 *Serg. & Rawle,* 6.   *The Schuylkill Navigation Company* v. *Thoburn,* 7 *Serg. & Rawle,* 411.

If then the plaintiffs have sustained an injury for which they have redress, they have mistaken their remedy in proceeding under the act of assembly.   But there is no redress for the grievance complained of.   The ninth section of the act incorporating the bridge company declares expressly, that they shall not injure, stop, or interrupt the navigation of the river.   Hence it follows, that if in order to preserve the navigation of the river, it became necessary to injure the bridge, the defendants had a right to do so, and the damage sustained is *damnum absque injuria.*

2. The second reason assigned for a new trial involves a question of considerable importance. It resolves itself into two propositions. *First*, Is a corporation dissolved by repeated neglects to elect officers and to comply with the other requisitions of the act authorising the grant of a charter of incorporation? *Second*, If the corporation be dissolved, can its dissolution be taken advantage of in this proceeding, and under the pleadings in this cause? In considering the first proposition, it is necessary to look to the origin, progress, and present condition of corporations. This is said to be the age of *improvement*, and particularly of *internal improvements*, and if so, the law must keep pace with the general progress of society. The doctrine to be found in the English books prior to the Revolution, has reference to a species of corporations then most usually existing, *viz.*, municipal corporations; but there is a wide difference between corporations established for the government of towns, and private corporations established for the purposes for which the plaintiffs were incorporated. It is to municipal corporations that *Blackstone* refers (2 *Bl. Com.* 37,) when he speaks of corporations as franchises. Of these corporations, it is said by *Domat* (452), that " their design is to provide some good that is useful to the public." All the foreign adjudications have favoured corporations on the ground, that through their instrumentality, the people regained from the crown some portion of those rights of which it had possessed itself. If the franchise ceased, it reverted to the crown, which was thus strengthened against the people. Here, on the contrary, the people are the only legitimate depository and source of power. Whatever is given to an association of individuals, is so much abstracted from the rights of the citizen, and when these rights are forfeited, from any cause, they revert to the community at large. A different reason existing, a different law must be the result. It is true that Chief Justice MARSHALL, in the case of *Dartmouth College* v. *Woodward*, 4 *Wheat.* 518, said, " that, the public benefit supposed to be derived, is such a sufficient consideration for the grant of corporate privileges, that when such a grant is made it is considered in the nature of a contract and cannot be revoked." Yet the accuracy of this doctrine, with the utmost deference to the high source from which it emanated, may be doubted. It seems to have been adopted without due regard to the distinction already adverted to. This case, however, decides nothing more than that a corporation for *literary and scientific purposes*, cannot be deprived of any thing strictly belonging to it. The policy of this country is to restrain, not to enlarge, corporate rights. *Beattie* v. *Lessee of Knowler*, 4 *Peters*, 152. In *England*, on the other, hand, the courts adopting the views of Sir *James M'Intosh*, that the revival of order, security, industry, trade and the arts, were attributable to the grants made by, or extorted from feudal tyrants to free cities and towns, from which all the free and regular government which succeeded the prostration of the civilization and science of the Roman empire proceeded, pursued

a different policy, and extended the circle of corporate privileges as widely as possible ; much more so than it would be expedient to do here.   The defendants do not ask that any thing properly belonging to the plaintiffs shall be taken from them ; they merely ask that they shall be confined to the path prescribed by the law.   They aver, that under the act by which the plaintiffs were created, there were certain conditions precedent to the grant of the charter, and certain conditions subsequent, necessary to be complied with, in order to secure a continuance of their corporate privileges.   Bridge companies are private corporations, created partly for the accommodation of the public, but mainly for the private emolument of the stockholders. They are permitted to take toll from citizens who are travelling, and their conduct should therefore be strictly guarded.   To entitle the corporation in question *to* perpetual succession, many things were necessary *to* be done on their part, and among others, they were bound to elect their officers annually, at the time, in the manner, and after giving the notice prescribed in the act.   (The different sections of the act incorporating the plaintiffs were here referred to and commented on.)   Municipal corporations have been held to be dissolved, even in *England,* by failure to elect officers on the charter day, when the chief officer was not entitled to hold over, inasmuch as the corporation had no power afterwards to elect one. *Angel & Ames,* 505.   This evil was remedied by the stat. 11, *Geo.* 1. ch. 4. sec. 1.   Chancellor Kent has indeed held, that though a corporation be dissolved, its powers cannot be taken from it collaterally, and that this can only be done by legal process.  4 *John. Ch. R.* 313. 5 *John. Ch. R.* 379.   But what is a collateral proceeding ?   Surely not a suit by the alleged corporation.   Under the general issue a corporation plaintiff must prove its existence.  *Angel & Ames,* 377. See also 5 *Mass. Rep.* 547.   3 *Mass. Rep.* 276.   12 *Mass. Rep.* 400. 10 *Mass. Rep.* 91.   The omission to comply with the requisitions of the act in this case, was clearly a forfeiture or loss of the charter, and the only question is, whether it can be taken advantage of in this proceeding.   The vast increase of corporations in *Pennsylvania,* now calls for a different rule on this subject, from that which at one time might have been deemed sufficient, and on this principle this court has acted.   In the case of *Bushel* v. *The Commonwealth Insurance Company,* 15 *Serg. & Rawle,* 176, in which it was decided that a writ of foreign attachment would lie against a corporation, Judge Rogers says, " with the multiplication of corporations which has and is taking place, to an almost indefinite extent, there has been a corresponding change in the law respecting them.   This change in the law has arisen from a change of circumstances, from that silent legislation by the people themselves, which is continually going on, in a country such as ours, the more wholesome because it is gradual, and wisely adapted to the peculiar situation, wants and habits of our citizens."   If it be said that the matter should have been pleaded in

abatement, according to the case of *First Parish* in *Sutton* v. *Cole*, 3 *Pick. Rep.* 245, the reply is, that whenever a plaintiff sues improperly, the defendant can take advantage of it on the general issue. It is to take advantage of an error in the character or number of defendants, that a plea in abatement is necessary.     *Wilson* v. *Wallace's ex'r.* 8 *Serg. & Rawle,* 53. *Kennedy* v. *Ferris,* 5 *Serg. & Rawle,* 396.   1 *Chitty's Pl.* 497.

3. It was not the design of the legislature to give to corporations a statutory remedy for injuries done to their property.   The third section of the act of 13th of *February,* 1822, vests in the *Lehigh* Coal and Navigation Company all the rights, privileges, immunities, &c. given by the act of the 20th of *March,* 1818, to Messrs. *White, Hauto* and *Hazard,* upon the same terms, and subject to the same duties imposed upon them ; and the second section of the latter act provides a remedy for *any person or persons* whose property may be injured by the works in contemplation.   The plaintiffs cannot bring themselves within the terms of the act, as they do not answer the description of *person* or *persons.*   When a statute is intended to embrace corporations, as well as natural persons, its usual language is, " *if any person or persons, bodies politic or corporate in law,*" &c. The omission of these customary words, clearly indicates the intention of the legislature not to extend the provisions of the act to artificial persons.

4. The verdict was erroneous as to the *quantum* of damages, and the extent of the injury for which they were to be recovered.   It makes the defendants pay for a pier which is still substantial and good, and which, according to the evidence, may last many years, as if it were entirely useless, dangerous, and ready to fall down.   It is a verdict in anticipation of a total loss, or a claim for a total loss without abandoning the bridge to the defendants. (The counsel here referred to and remarked upon the evidence in support of their views on this point ; they also cited *The Schuylkill Navigation Company* v. *Thoburn,* 7 *Serg. & Rawle,* 411, for the rule by which damages are to be estimated.)

5. The jury ought to have taken into consideration the advantages which the plaintiffs derived from the works of the defendants, as well in the general increase of travelling, as in the profit derived from the contractors, and those employed by the defendants, in crossing and recrossing.   The act of assembly expressly declares, that the advantages derived to the owner or owners of the premises alleged to be injured by the improvement of the navigation, shall be taken into consideration in the assessment of damages.   That the plaintiffs were benefitted by the works of the defendants, cannot be denied, and if so, that benefit must be considered in a claim for damages, under the provisions of this act.   If, on the other hand, the property of the plaintiffs was of such a nature, that it could not possibly be benefitted by the improved navigation of the river, it was not in the

(Lehigh Bridge Company *v.* Lehigh Coal and Navigation Company.)

contemplation of the legislature, and injury to it was not provided for, and consequently no proceeding founded upon the act can be maintained to recover damages.

*Gibon* and *J. Sergeant,* for the appellees, (who were requested by the court to confine their argument to the *first* and *fifth* points) argued:—*First,* That the cases referred to by the opposite counsel, to show that corporate grants are to be strictly construed, establish that position in favour of individuals. This is a case of corporation against corporation, with this difference as to their rights, arising from their relative situations ; that the Bridge Company being in the position in which individuals are usually placed, are entitled to a liberal construction in their favour, and a strict one against the defendants, who are asserting their corporate rights. There are two kinds of wrong which may be done to an individual by a corporation; the one by a rightful, the other by a wrongful act. The first is within the charter powers of the corporation; the last is not. The legislature cannot grant the power to commit the first, without at the same time providing a compensation for the injury inflicted. Where they give no remedy for an act to be done by a corporation, the commission of that act makes the corporation a wrong-doer in respect to the injured party. The legislature, therefore, usually provides a remedy co-extensive with the injury produced by the exercise of the privilege granted. The remedy, thus provided, is for the advantage of the corporation, and granted at their request, to protect them from incessant liability to common law remedies. It is a fair construction of such an act, to extend the remedy to every injury which can be committed by a corporation within the limits of its charter. That an injury has in the present instance been sustained by the plaintiffs, for which they are entitled to some remedy, it is going too far, to deny. On this point, the case of *The Chesnut Hill and Spring House Turnpike Company* v. *Rutter,* 4 *Serg. & Rawle,* 6, is conclusive. It differs essentially from the injury complained of in *Shrunk* v. *The Schuylkill Navigation Company,* 14 *Serg. & Rawle,* 71, in which it was held, that the owner of a fishery is not entitled to damages for an injury sustained in consequence of erecting a dam across the river, which prevented the fish from passing up the stream. The basis of that decision was, that no man could in point of law be injured, by being deprived of that which did not belong to him. On the contrary, he should be thankful that he has been permitted to enjoy it so long. But the injury complained of in the present case, is of a different character. It is an actual injury to substantial and valuable property, belonging to the Bridge Company ; not to a common property, like a fishery, in which the whole community has equal rights, but in relation to which the owner of the adjoining shore possesses certain advantages arising from the accident of situation. Unlike the owner of a fishery, the Bridge Company have exclusive rights, privileges and property. No one can cross the bridge without

paying toll, any more than he can pass through the *Lehigh* canal without paying toll, and if the legislature were to pass an act authorizing that to be done, the defendants would hardly say it was *damnum absque injuria.* This part of the case is too clear for furthur argument. Is then the injury sought to be redressed, comprehended within the special provisions of the act of assembly? If it is, it is the only mode of redress to which the plaintiffs can resort, as they are cut off from a common law remedy where a statutory one is given. Act of 21st of *March,* 1806, *Purd. Dig.* 34. The case of *The Chesnut Hill and Spring House Turnpike Company* v. *Rutter,* 4 *Serg. & Rawle,* 6, strongly supports the affirmative of this proposition. Whatever is authorised by an act of the legislature, is within its remedial provisions. The only safe course is to make the remedy co-extensive with the injury sustained. The second and third sections of the act " to improve the navigation of the river *Lehigh,*" which must be taken in connection with each other, provide a remedy for all injuries resulting from the erection of dams, or the inundation of the lands of any person, by swelling the water by means of dams, &c. Under the provisions of this act, the company had a right to erect dams, when and where they pleased, to leave a sluice, and to do many other things, the effect of which would be necessarily injurious to the property of others. But this unquestionable right was coupled with a condition, that they should make an adequate compensation for the damage they might produce, in the manner indicated by the act. As the right was without limitation, so must be the remedy. The injury was the immediate and necessary consequence of the erection of the defendants' works. Had it not been for the existence of the dam and the sluice, no injury would have taken place. The bridge had stood floods before, which were by no means extraordinary occurrences. They are as regular in our rivers as the rise of the *Mississippi* or the *Nile;* every one takes them into calculation; in every river there is a low-water mark, to distinguish it from the high-water mark occasioned by freshets. The legislature knew what would be the probable consequence of the construction of the works, for the improvement of the navigation of the *Lehigh,* and it is impossible they could have intended to grant the right of destroying the bridge, without compensation. Before the grant, the defendants had no right to the river. They take it subject to the condition of making compensation in the manner prescribed by the act. The question of damages may be perplexing, but that is no reason for denying them, if an injury has been sustained. This is one of the chief difficulties of this case, but such difficulties exist in every case, and the jury must get at the standard of damages in the best manner they can. They must consider the matter in some degree prospectively; they must examine witnesses to ascertain as well the injury actually sustained, as that which will probably ensue; and come as near to a just result, as the nature of the case will permit. In actions of slander, the difficulty of determining the exact amount of injury done, is

(Lehigh Bridge Company *v.* Lehigh Coal and Navigation Company.)

infinitely greater, yet this is never urged as a reason why damages should not be given. Why then be so scrupulous in a case like this? To suppose the legislature intended to confer on the defendants the power to commit such injuries, without at the same time intending to provide a remedy, would be to impute to them the greatest injustice.

5. The charge of the judge was in accordance with the act of assembly. The jury are to take into consideration the advantages which may be derived, and not those which have been derived from the works of the Coal and Navigation Company. The charter to the Bridge Company is a contract between that company and the people, and there is no mode by which the grant can be resumed, or the advantages secured to them taken away, but by a violation of the charter on the part of the company, or by purchase, in the manner pointed out by the act. The advantages which the legislature had in view, when they said they should be taken into consideration in assessing damages, were those of a permanent and substantial character; not temporary and accidental, as these were. The right to take toll was given as a compensation for the use, and wear and tear of the bridge, and it is plain, that its increased use must increase its wear and tear, require additional expense to keep it in order, and accelerate its destruction. It by no means follows from the increase of travelling, that the value of the property is increased. The stock of the *Germantown* Turnpike Company was once as high as a hundred and nineteen; it is now below fifty, yet travelling on that road has greatly increased. The same thing may be predicated of many other turnpike roads. His Honour, therefore, did not err in saying, that the advantages arising from an increase of tolls, in consequence of an increase of business produced by the defendants' works, ought not to be taken into consideration by the jury.

The opinion of the court was delivered by

Gibson, C. J.—As the cause is to go to another jury, it is necessary to determine all the points; and haply they are not attended with difficulty. The legislature evidently meant to provide for nothing that was not remediable at the common law; and on the other hand, it was intended that every common law injury should be redressed by the statutory remedy. A corporation then must be let into the benefit of it, or be left without redress; so that taking an artificial person not to be within the letter of the act, it is clearly within the equity of it, and the statutory provision being remedial, is to be extended to cases in equal mischief. Still it has been insisted, that the corporation plaintiff was dissolved, by having omitted to continue the succession to certain offices supposed to be integral parts of its body. These, however, were supplied with officers *de facto,* which was undoubtedly sufficient to sustain its existence as to strangers. It is now well understood, that the loss of an integral part, works a dissolution only to certain purposes; the corporate franchise being

suspended, but not extinguished. An entire dissolution, being the consequence of permanent incapacity to restore the deficient part, never happens where the legitimate existence of the part is not indispensible to a valid election, or other means of reproduction: and here it is perfectly clear that a new election might be had. This principle was asserted for satisfactory reasons in *Phillips* v. *Wickham,* 1 *Paige,* 590 ; and in *Slee* v. *Bloom,* 5 *Johns. Ch.* 366, we have the very case. There a corporation was not dissolved by an omission to elect trustees for more than two years, the members constituting the integral parts having remained *in esse,* and continued in office till others were elected ; and had the rule been otherwise, it was held that a forfeiture of the charter for abuse or neglect of its franchise, must be declared by process and judgment of law, before the corporation can be treated as defunct. Still further it was held, in *First Parish,* in *Sutton* v. *Cole,* 3 *Pickering,* 245, that the existence of a corporation plaintiff is to be brought in question only by plea in abatement; and the same view seems to have been taken by a majority of the judges in *Monumoi* v. *Rogers,* 1 *Mass. R.* 159. Certainly the matter must be put in issue by such a plea, or at least one which denies the whole declaration; for pleading over specially to the merits, as was done here, clearly admits the plaintiff's capacity to sue. On all these grounds, then, the point of corporate existence was sufficiently established.

The principle involved in the exception, that the verdict is against law and the evidence, though perfectly plain in itself, is more doubtful in respect of its application to the facts. The defendant had the same right to erect the dam at the particular place, that a proprietor has to erect a dam on his own land ; and if chargeable with no want of attention to its probable effect, is not answerable for consequences which it was impossible to foresee and prevent. Where a loss happens exclusively from an act of Providence, it will not be pretended that it ought to be borne by him whose superstructure was made the immediate instrument of it. Had the timbers of this dam been torn from its foundation by the violence of a flood, and carried with irresistible force against the bridge, the defendant could have been made liable but by proof that the timbers had been left exposed without proper fastening, during the season of high water, and ice, when such an event was to be expected. It will be seen, therefore, that the concurrence of negligence with the act of Providence, where the mischief is done by flood or storm, is necessary to fix the defendant with liability. I have found no case illustrative of this principle where the loss was occasioned by water, but it is plainly established by those in which the agent was fire. For instance, an action on the case lies on the custom of the realm, against the master of a house, if a fire, accidentally kindled in it, consume the house or goods of another ; and this, though it be kindled without the knowledge of the master, and by a servant, guest, or any one else, who has entered by his consent. 1 *Rol.* 1. 1. 25. 3 *Lev.* 359. 1 *Salk.*

(Lehigh Bridge Company *v.* Lehigh Coal and Navigation Company.)

319.  It would be otherwise, however, if the fire were kindled by lightning.   In *Turbervil* v. *Stamp*, 1 *Salk.* 13, the distinction is perhaps more intelligibly put.   To an action on the custom of the realm, for negligently keeping fire in a close, by which the plaintiff's grass was burnt in an adjoining close, it was objected that the custom extends only to fire in the house which is within the party's power : but it was not allowed ; " for the fire in his field," it was said, " is his fire, as well as that in his house ; he made it, and must see that it does no harm, or answer the damages if it does.   Every man must use his own so as not to hurt another ; but if a sudden storm had risen which he could not stop, it was a matter of evidence, and he could have shewn it."   (*S. C. Skinner*, 681, and *Comyn's Rep.* 32.) From motives of sympathy for the unfortunate master of a house in which a fire has originated, actions on the custom are abolished by the stat. 6 *Ann*, c. 31 ; but that there was nothing local or peculiar in the custom, is shewn by *Clay's case*, (*Cro. Eliz.* 10,) in which it being mooted whether a man who shoots at a fowl and fires his own house, by which that of his neighbour is consumed, be liable on the custom, it was answered, that he is not, but that he is liable in an action on the case generally, for the injury is the same whether the mischance be by negligence or misadventure.   The ground work of the common law principle seems to be, that some degree of negligence is imputable in every case of accidental fire, produced by human means ; and it is universally just that a loss shall be borne by him whose act contributed to it.   In the case at bar then, it will be for the jury to inquire whether the defendant used all proper precaution to prevent consequential injury.   It would seem the river is between five and six hundred feet in breadth ; that the bridge is supported by three piers ; that in the dam placed between eighty and a hundred feet above it, a chasm was left for the passing of rafts, which directed the volume of the water against the centre pier ; and that this chasm was thus left for at least six months during the season of rain and ice when high floods are expected to prevail.   It will become a question depending on a due consideration of these facts, whether danger to a pier thus exposed, was not to be apprehended, and whether the agents of the defendant were not bound to inquire into the nature of its foundation, and every circumstance *that* might conduce to a just estimate of the risk.   It will be worthy of inquiry, too, whether the duration of the exposure was not unnecessary and unreasonable, and whether the construction of the body of the dam, ought not to have immediately preceded the permanent provision, if any were intended, for the accommodation of those who should prefer to use the bed of the river. Should the defendant be found delinquent in these respects, compensation will be made in damages ; the measure of which, however, ought not to be the entire cost of a new pier (the standard assumed by the jury in the present instance) unless the old one should be found altogether worthless.   But the evidence is strong to shew that it may last not only many years, but as long as if its foundation had not been

(Lehigh Bridge Company v. Lehigh Coal and Navigation Company.)

disturbed, the effect of the current being to fill up the excavation, and rather to repair the injury, than increase it. Concurring then with the judge who tried the cause, that the damages are excessive, we feel ourselves bound to direct another trial.

Judgment reversed and a new trial awarded.