# Dugan *versus* The Bridge Company.

A proviso or saving clause which is repugnant to the purview or body of the act, is not to have effect, but this principle does not apply where such proviso is part of an act constituting a private corporation, which in such case is to be taken as an essential condition of the compact between the public and the corporation.

An act of incorporation is a compact between the public and the company, but the rights of the company are only such as the very terms of the enactment confer, and any ambiguity in them must operate against the company and in favour of the public.

Where the legislature authorizes a company to build a bridge over a navigable stream, but enacts in the charter that they shall not impair or obstruct the navigation, if they accept the franchise they take it *cum onere*, and must enjoy it subject to the condition.

The navigation of our rivers is a favoured right in Pennsylvania, and has been sedulously guarded by legislative action and judicial opinion.

A condition in a charter, authorizing a company to build a bridge over a navigable stream, that it shall not "injure, stop, or interrupt the navigation," is not performed by building the bridge in such manner as to do as little injury as possible to the navigation, as it existed at the time the bridge was built.

If the structure at any time during its continuance actually "injures, stops, or interrupts the navigation," it is unauthorized, and the company is liable to the party injured for the damages thereby sustained.

The condition not to injure the navigation is not limited to the kind and amount of trade upon the stream at the time of the enactment, but extends to the increased business incident to the growth of the country and the expansion of commerce.

If the obstruction was occasioned by artificial causes created by third persons, the company would not be responsible: but if occasioned by natural causes, influenced in their operation by the piers of the bridge, the corporation would be liable for the consequential damage flowing from their act, as much as if the act itself had occasioned the injury without an intermediate agent.

Whether such a bridge is a public nuisance can only be determined by a proceeding instituted and prosecuted by the public authorities.   Per WOODWARD, J.

ERROR to the District Court of *Allegheny county*.

This was an action on the case by John Dugan against the President, Managers, and Company, for erecting a bridge over the Monongahela river opposite the borough of Pittsburgh, in the county of Allegheny, to recover damages sustained in the loss of a coal-boat, laden with bituminous coal, which was wrecked in November, 1853, against the second pier of the defendants' bridge from the Pittsburgh side.  The plaintiff alleged in his declaration, that the pier in question was located in the coal-boat channel, at ordinary stages of the water, and that it was a great nuisance and obstruction to the navigation of the river and unauthorized by law; that the Monongahela river is a public highway, navigable for "boats, rafts, and other vessels," the free use and navigation of which belonged of right to the plaintiff, &c.   He also alleged

[Dugan *v.* Bridge Company.]

that he used proper care and skill in navigating his boat, and that the defendants were liable to compensate him for the loss he had sustained.

. On the trial in the court below, the plaintiff produced and read in evidence the Act of 19th March, 1810, authorizing the incorporation of defendants, and also the subsequent Acts of 17th Feb. 1816, and 17th Feb. 1818, by which the Act of 1810 was continued in force. By the Act of 13th April, 1782, § 4, the Monongahela river was declared a public highway. The Act of the 14th August, 1725, provides: "That no bridge, frame, or device whatsoever shall at any time to come be made, erected, upheld, sustained, or repaired, over any creek or river within this province, navigable for any sloop, shallop, flat, or any other craft, that shall or may anywise stop or hinder the navigation of any such sloop, shallop, flat, or other craft, or floats of logs: any law, custom, or usage to the contrary notwithstanding." To the 8th section of the Act under which the defendants are incorporated is appended the following: "*Provided*, That nothing in this act contained, shall authorize said company to erect said bridge, without the consent of the owner or owners of the ground on each side of the river; or *to erect the same in such manner as to injure, stop, or interrupt the navigation of said river by boats, rafts, or other vessels.*"

The evidence showed the boat was lost by striking the pier in question, and that proper care and skill were used to avoid it; that the pier stands in the coal-boat channel, near the middle of it, and is an obstruction to coal-boats at all times, and especially when the rapidity of the current is increased in consequence of the Monongahela having risen higher than the Allegheny; that the bridge obstructs the view of the headlands and marks beyond it, and that boats are consequently impeded and delayed in passing the bridge.

The witnesses examined by the plaintiff on this point were coal-boat pilots, who were familiar with the navigation at that point, and their testimony extended back from fifteen to forty years; some of whom considered this pier the most dangerous obstruction to the navigation between Pittsburgh and New Orleans.

The defendants contended that the bridge, as erected, did not impede or obstruct the navigation, and that if it did, they were protected under their charter, and had a right to erect the bridge in the manner they have done.

The testimony brought forward by the defendants did not differ materially from that given by the plaintiff's witnesses.

The plaintiff submitted the following points, and prayed the court to instruct the jury accordingly:—

1. That the Monongahela river is a public highway, and as such should not be obstructed, or impeded in its use or navigation, *in the smallest degree*, except by the authority of the legislature.

[Dugan v. Bridge Company.]

2. That the pier of defendants' bridge, against which the plaintiff's boat stoved, is a nuisance, unless placed where it is by authority of the legislature.

3. If the jury believe that the pier in question was placed in, what was at the time a navigable channel of the river, it necessarily *injured, stopped, or interrupted in some degree* the navigation of said river by *boats, rafts, or other vessels*, and was therefore not authorized by the charter.

4. If the jury believe that said bridge, when built, was at such time an injury, stoppage, or interruption of the navigation of the said river, by boats, rafts, or other vessels, it is a nuisance and unauthorized by law.

5. If the jury believe that said bridge *is now* such an obstruction to the navigation, it is unauthorized by law.

6. If the jury believe that the plaintiff exercised proper care in passing the defendants' bridge, at the time in question, and that the boat and coal were lost in consequence of damage received in coming in contact with the second pier from the Pittsburgh side of defendants' bridge, the plaintiff is entitled to recover full compensation for all damage sustained in the premises.

7. That the damage done in striking the pier is sufficient to render the defendants liable, though afterwards the boat was destroyed, when it struck on the island, by the flood, providing that plaintiff used proper exertion and care to save and protect the same, after the injury done by the pier, and before the flood came.

8. That defendants were bound, when rebuilding the bridge, in 1845, to so construct it as not to injure the navigation of the river.

· The court below (HAMPTON, P. J.) instructed the jury, and answered the points as follows:—

" The legislature intended to authorize the defendants to erect a bridge over the Monongahela river, and their act must be so construed as to give it a practical effect. If construed according to the strict letter of the proviso in the 8th section, the act of incorporation would be a nullity, unless the bridge could have been thrown across the river by a single span; which, according to the science of bridge building at that early day, you may perhaps think was impracticable.

" But we must give to this, as to all other statutes, a reasonable construction, which is, that the defendants are authorized by their charter to erect and construct a bridge across the Monongahela river according to the art of bridge building at the time; causing as little injury and obstruction to the navigation of the river as possible.

"*They were not bound to foresee what no amount of human sagacity could divine, the extraordinary development and increase*

[Dugan *v.* Bridge Company.]

of the coal trade upon the river as it now exists. The exercise of ordinary foresight and judgment only were required of the company. If they constructed their bridge in accordance with these principles, they are not responsible to the plaintiff for the loss he may have sustained : Bacon *v.* Arthur, 4 *Watts* 37.

" Whether they did so or not, is a question of· fact for your determination ; *on this question, no person skilled in the art of bridge building at the time has been examined.*

" The evidence bearing directly on that point, is such as tends to prove the condition of the channel and bed of the river, the distance between the piers, and their relative position in relation to the channel. According to the testimony of Mr. Hart, the piers are 177 feet 5 inches apart at the tops. The first pier, it seems, stood in the channel as it then was ; the second in shoal water, or on the edge of the bar, according to some of the witnesses ; or, as others think, in the channel also. Could and ought either or both of these piers have been dispensed with, thus doubling or greatly increasing the length of the spans ? You will take into careful consideration all the evidence in the case, and apply to the facts as you find them, the rules of law laid down by the court.

" In answer to a question by a juror, in relation to the superstructure, the court instruct the jury, that if the original superstructure was erected according to law, although it may have rendered navigation less safe, by obstructing the navigator's view of ' marks,' such as headlands, &c., by which to direct his course, the company, in rebuilding in 1845–6, if they had notice of the obstruction, and could do so without unreasonable expense to themselves and inconvenience to the public, were bound to change the former elevation of the bridge so as to obviate the difficulty. But, if they had no knowledge of said difficulty, or obstruction, and had no reasonable grounds to apprehend its existence, they would not be bound to change its original elevation."

1st point. "Affirmed."

2d. " Affirmed, if it obstructs the navigation."

3d. "Negatived."

4th. "Negatived, if the jury believe the bridge was erected in accordance with the charter, and so as to do the least possible injury, or cause the least obstruction to the navigation."

5th. "Negatived, if the jury believe the facts stated in answer to the 4th point ; and that the channel or navigable portion of the river has been shifted or changed by natural causes, or by artificial causes created by third persons."

6th. "Negatived, subject to the answer to the 4th and 5th points."

7th. " This proposition is true, if the defendants are liable at all, under the instructions already given."

[Dugan v. Bridge Company.]

8th. "If the piers had been swept away, or destroyed, and defendants were about to rebuild them, they would be bound so to place their piers in reference to the then existing state of the channel as to do the least injury to the navigation, consistently with their rights and privileges under their charter."

The jury found for the defendants.

Whereupon the plaintiff sued out this writ, and assigned for error the answer of the court to the points propounded, and that part of the general charge contained in italics.

*Burke* and *Watson*, for plaintiff in error.—The doctrine contended for in this case is as old as the common law, and our statutes only give additional emphasis and force to the law as it stood centuries ago.   The navigation of rivers is certainly not of less importance now than it was then.   As commerce and trade extend and expand, it is the true policy of government to prevent everything that "hinders, stop, or interrupts" the navigation.   The vast coal trade of the Monongahela valley could not be developed in a day, nor in a century; and it was the duty of defendants to know that they could not obstruct this highway. And of this the Act of 14th August, 1725, and the proviso to the 8th section of their act of incorporation, gave them ample notice.

A corporation derives all its power from the law creating it: Wolf *v.* Goddard, 9 *Watts* 550: and any ambiguity in the charter must operate against the company; Commissioners *v.* Gas Co., 2 *J.* 321; Plummer *v.* Alexander, 2 *Id.* 86; 11 *Peters' Rep.* 545. It is ruled also in Trenton Water-Power Case, 6 *Pa. L. J.*, that private corporations take their privileges subject to the rights of individuals and communities.   And the case of the Commonwealth *v.* The Erie & N. E. R. R. Co., *MSS.* 1854, rules that under an act which forbid the company "to impede the free use of any public road, street, lane, or bridge," the laying down of a railroad upon such road, &c., was *per se* an obstruction.

If the charter had been entirely silent on the subject, the defendants would at least have been bound to use ordinary care and foresight to avoid hindrance to the navigation, but the proviso so quoted adds an express injunction in this case.   But to this the court reply that *still* the company were only bound to exercise ordinary care, skill, and foresight.   But the evidence shows it was an obstruction when first built, and the evil only becomes greater as the trade increases.   No lapse of time can legalize a nuisance: Commonwealth *v.* Miltenbenger, 7 *Watts* 450; Commonwealth *v.* Vansickle, 7 *Pa. L. J.* 82; *Bright. Rep.* 69; Case of the Wheeling Bridge, 13 *How.* 518; Jolly *v.* The Terre Haute Bridge Co., 3 *Am. L. R.* 36; Devoe *v.* Penrose Ferry Bridge Co., 3 *Am. L. R.* 83.

No expert was examined as to whether the bridge could have

[*Dugan v.* Bridge Company.]

been differently constructed. It was therefore error for the court to submit to the jury the question whether ordinary care, &c., had been used, when there was nothing from which they could find; for, to leave a fact to the jury of which there is no evidence, is well settled to be error : Moorhead *v.* Fitzpatrick, 5 *W. & S.* 508 ; 6 *Id.* 188 ; 5 *Id.* 523 ; 1 *Barr* 82.

*Williams* and *Shaler*, for defendants in error.—The first error assigned is in the refusal of the court to say that if the offending pier was built in a navigable channel, it was *per se* a nuisance, and was, therefore, unauthorized.

The effect of the plaintiff's doctrine would be to make an end of all bridges over navigable rivers. That it is not law, however, is shown by the practice of the whole country, as well as by the following among many other authorities.

That the legislature has authority to obstruct navigable rivers by authorizing the erection of bridges over them : Commonwealth *v.* Charleston, 1 *Pick.* 180 ; Commonwealth *v.* Coombs, 2 *Mass.* 489 ; Wales *v.* Stetson, 2 *Mass.* 146 ; Arundel *v.* McCullough, 10 *Mass.* 70 ; Hood *v.* Dighton Bridge, 3 *Mass.* 267 ; Charles River Bridge *v.* Warren Bridge, 7 *Pick.* 446 ; Charlestown *v.* Middlesex, 3 *Metcalf* 202.

Although great solicitude has ever been manifested to prevent obstructions from being created in navigable waters, and great vigilance exercised in requiring bridges to be provided with suitable draws to facilitate the passage of vessels, yet, in some instances at least, the passage of vessels of a description which before had been accustomed to pass, has been entirely prevented. *In all cases the legislature has the power to inquire when the public convenience and necessity demand these partial obstructions and interruptions to navigation, and upon what terms and conditions they may be established :* Commonwealth *v.* Breed, 4 *Pick.* 463.

The construction of a drawbridge not inconsistent with the ordinance of 1787 : Palmer *v.* Cuyahoga Co., 3 *McLean* 226 ; 2 *Carter* (*Ind.*) 591.

If a bridge is built and it is necessary for the convenience of the public, and does not prevent the free use of the stream as a public highway, although it may have occasioned some slight inconvenience to those who had been in the habit of navigating the stream, by obliging them to take some additional precautions in passing it, it will not be necessarily considered as a nuisance : Williams *v.* Beardsley, 2 *Carter* (*Ind.*) 591 ; The People *v.* The Saratoga & Rensselaer R. R. Co., 15 *Wend.* 115.

And the long-settled practice in this state, extending as well to mill and slackwater dams as to bridges, is evidence of the uniform understanding here.

The next objection is to the refusal to charge absolutely, that

if the bridge was an interruption at the time when built, it is a nuisance and unauthorized. The court say that if it was built in accordance with the charter, and so as to do the least possible injury, or cause the least obstruction, then it was not a nuisance. And in this they are supported by the case of Bacon *v.* Arthur, 4 *Watts* 438, wherein it was held that the proviso in regard to mill-dams, which is the same as that in the defendants' charter, would, if taken literally, be inconsistent with the grant itself.

The opinion of the court was delivered by

WOODWARD, J.—The franchise conferred on the defendants was a right to erect and maintain a toll-bridge across the Monongahela at Pittsburgh, and involved necessarily the right to build piers in the bed of the river, but it was coupled with a condition very distinctly expressed in the proviso, that the company should not erect the bridge in "*such manner as to injure, stop, or interrupt the navigation of said river by boats, rafts, or other vessels.*"

One or two questions arise upon the construction of this legislation, which it is proper first of all to notice.

It is said that the proviso must not be so construed as to defeat the general purpose of the act of incorporation, and that, as piers were indispensable to a bridge, and necessarily obstructions more or less of the navigation, the legislature must be understood to have meant that the company should injure, stop, or interrupt the navigation as little as was consistent with the main object of the enactment.

It is a general principle in the construction of statutes that a proviso or saving clause, which is directly repugnant to the purview or body of the act, is not to have effect; but there are two reasons why this principle is not applicable here. In the first place the repugnance is not apparent. It was not shown on the trial, and we do not know, that a pier in a river is *per se* injurious to the navigation. It may possibly be capable of such location and construction as to throw an increased volume of water into the channel, and thus to benefit rather than injure the navigation.

But a more comprehensive reason why the principle suggested is not applicable here, is, that this proviso is part of an act constituting a private corporation, and therefore to be taken as an essential condition of the compact between the public and the corporation. It is now the settled doctrine, both of the English and the American courts, that an act of incorporation is a bargain between a company of adventurers and the public—that the rights of the corporation are such as the very terms of the enactment confer—and that any ambiguity in them must operate against the adventurers and in favour of the public: 2 *B. & Ad.* 793; 11 *Pet.* 545.

And, in measuring corporate rights, we are to look at all the

terms employed in the fundamental law or compact. We can no more cut out some of them or mitigate their legal effect because they are in a proviso, than we could qualify the terms of a private agreement because found in one part of the instrument instead of another. The whole instrument is to be taken together as expressing the final intentions and purposes of the parties. When the legislature tells a company, you may erect a bridge over a particular stream, provided you do not impair the navigation thereof, it is for the company to determine whether they will accept the franchise on such a condition; but if they accept it, they take it *cum onere*, and, having no rights outside of their charter, they must enjoy their franchise subject to that condition or not enjoy it at all.

The navigation of the streams of a country is a great public interest, and the law has always treated obstructions as public nuisances. In Rex v. Clark, 12 *Mod.* 615, Ch. J. HOLT said, that to hinder the course of a navigable river was against Magna Charta; and many subsequent statutes have punished it, in England, with specific penalties. In this country, and especially in Pennsylvania, the navigation of our rivers has been sedulously guarded both by legislative action and judicial opinion. We began by reserving the beds of our principal rivers for the use of the public, and granting the land to riparian owners only to low-water mark. In Carson v. Blazer, 2 *Bin.* 475, and Shrunk v. Schuylkill Nav. Co., 14 *S. & R.* 71, the common law definition of navigable rivers, limited to those in which the tide ebbs and flows, was exploded; and, in many cases since, the right of navigation has been held paramount to the rights of fisheries, ferries, mill-dams, and internal improvement companies. It was almost the only public right enjoyed by the hardy pioneers into what used to be called our "back lands," and has been the source of incalculable wealth and comfort to the people of the state. It was this right the legislature guarded from intrusion by the proviso in question; and it is too important, and too well defined in law, to be sacrificed to a mere technical rule of construction. The legislature may have the power to part with it, but with the words of the proviso before our eyes we have not the power to say they have done so. On the contrary, it seems to us that the authority conferred was to build a bridge that should not injure, stop, or obstruct the navigation of the river.

Another idea suggested, and which found favour with the court below, was that the company was not bound to foresee the extraordinary development and increase of the coal trade upon the river as it now exists. This, taken in connexion with the ruling that they were empowered to build a bridge, causing as little injury and obstruction to the navigation as possible, amounts to this— that however great a nuisance the piers of the bridge are, now

[Dugan *v.* Bridge Company.]

that a large business is carried on along the river, yet the company is not liable to an injured party if, thirty or forty years ago, when they built the bridge, they obstructed the small trade of that day as little as possible.

This phrase, *as little injury as possible*, besides being a loose reading of the proviso, is too indefinite for the purposes of the present case. The plaintiff may have had his whole fortune embarked in the boat which the defendants obstructed and destroyed, and yet his loss, as compared with the whole coal trade, was doubtless very small. If the terms " as little injury as possible" are to include anything, a single boat-load of coal would not be an unreasonable sacrifice to the great public objects contemplated by the charter; and yet to the plaintiff the loss might be ruinous. Is he to bear it, when his .right of navigation has been reserved in express terms by the legislature? We think he has a right to insist on the performance of the bargain, or compensation in damages. But he is part of the increased coal trade : does that make any difference in his rights? The legislature must be presumed to have had all the natural growth of this trade in view when they authorized the bridge. The presence of coal in the lands drained by the Monongahela, its value for fuel, the constantly increasing market, and the dependence on this source of supply of those rapidly-peopling regions south and west, were well known to the legislature. Did they not foresee that these circumstances would increase the demand and supply, and that this great natural outlet would be needed to accommodate both producers and consumers? How can a doubt be entertained on this point, when we find them guarding the navigation by language as express and precise as it is applicable to the trade of this day?

To limit their language in the manner proposed, is to sacrifice the many to the few—the large trade of our time to the small trade of an earlier day. It is better reason to say that if the legislature thought the few citizens then engaged in the navigation of the river worthy of protection, much more the many who are now engaged. The language employed was accordingly large enough to comprehend all. But if the legislative intention comprehended the future and possible trade, so did the corporate intention, because the corporation accepted the bargain in the terms in which the legislature expressed it. Deducing the intention of one party from the terms of the contract, we get at the intentions of both, and are enabled to say that the true meaning of the act of incorporation is that the bridge was to be so built as not to injure, stop, or interrupt the navigation either then or now, whether in its infancy or full growth.

One other point in the ruling of the court .below is to be noticed. They were asked to say that if the jury believe the bridge is now an obstruction to the navigation, it is unauthorized by law. The

[Dugan *v.* Bridge Company.]

answer was in these words: "Negatived if the jury believe the facts stated in answer to the 4th point, and that the channel, or navigable portion of the river, has been shifted or changed by natural causes; or by artificial causes created by third persons." The answer to the 4th point was, that if the bridge was erected in accordance with the charter, and so as to do the least possible injury, or cause the least obstruction to the navigation, it was not a nuisance.    Taking the two answers together, the doctrine taught was that a bridge constructed on the above principle, would not become a nuisance by change of the channel.  We have not the evidence in reference to a change of the channel, but if it was changed by artificial causes, created by third persons, we agree it could not affect the rights of the bridge company.  If, however, it was changed for the worse by natural causes, influenced in their operation by the piers of the bridge, the defendants would be responsible for it.  They were bound to foresee the natural and necessary effects of placing piers in the river.  If the piers themselves did not interfere with the channel, but threw sand and other obstructions into it, whereby it was ruined, or the navigation injured, the company would be as much liable for a consequential injury flowing so directly from their act, as they would be if the act itself had wrought the injury without an intermediate agent. On this point the case of Bacon *v.* Arthur, 4 *Watts* 437, is direct authority.  In pursuance of our Act of 23d March, 1803, relative to mill-dams in navigable streams, the defendant had built a dam in a creek which had been declared a highway.  The act provided that the party erecting such dams " shall not obstruct or impede the navigation of such stream."  It was alleged that the dam had changed the natural flow of the water, and caused certain mounds and bars to be thrown up, whereby the natural channel was obstructed.  The court below put the cause on the point, whether the dam had been scientifically erected, and instructed the jury that if they believed it had been so erected, and that the bars were the necessary and inevitable effect of such erections, the plaintiff could not recover.  In reversing this opinion Judge ROGERS said, " where the injury arises from a bar which is the immediate effect of a dam erected in the bed of a river, I cannot bring myself to doubt but that it is such an obstruction of the navigation as was in the view of the legislature, and is embraced in the proviso." He then goes on to distinguish this class of cases from that of the Lehigh Bridge Company *v.* The Lehigh Coal and Navigation Company, 4 *Rawle* 24, which was the case of injury resulting from the act of Providence, without fault in the defendant.  Both on reason and authority we think the court erred in so much of their answer to the 5th point as relates to a change of channel through natural causes.

[Dugan v. Bridge Company.]

We have now alluded to those views of the chartered rights and duties of the defendants which prevailed to defeat the plaintiff's action in the court below.   There was no question of negligence on his part.   As presented to us in the record, it is the case of a citizen navigating the Monongahela with due diligence and skill, but losing his property by reason of the piers placed in the river by the defendants.   They justify the obstruction, and are bound to bring themselves within the Act of Assembly : Com. v. Church, 1 *Barr* 105.   Interpreting that in the manner we have indicated, it will be for a court and jury to say, on a re-trial, whether they have brought themselves within it—whether they have injured, stopped, or interrupted the navigation of the river.   If they have done what the legislature forbid, they are liable to the plaintiff for the injury which their wrongful act has caused him.

But this is as far as the case requires or permits us to go.   It is a private action, and not a public prosecution.   The right of the company to maintain their bridge is drawn in question only incidentally, and is not concluded by anything we rule in adjusting the plaintiff's private rights.

Whether it is a public nuisance or not, is a question which can only be determined by indictment at law, or a bill in equity, to be prosecuted in either case at the instance of the public authorities. In respect to public rights, the construction which the court below gave to the proviso may very possibly be held to be the sound one. The long acquiescence of the public and the great convenience of the bridge, as well as the vested rights of the corporators, are circumstances that would have weight in such an inquiry, but have none in this.   Besides, if it should be found in such an inquiry that the violation of the charter consisted in an excess beyond the limit prescribed, the remedy would be, not utterly to demolish the bridge, but to remove the excess, and adapt the erection to the design of the law : Dyer v. Depui, 5 *Wh.* 597.

Judgment reversed and a *venire de novo* awarded.