[PHILADELPHIA, 1840.]

## CASE OF "THE PHILADELPHIA AND TRENTON RAIL ROAD COMPANY."

### CERTIORARI.

1. On a certiorari to remove proceedings in the case of a road, no point can be made which is not apparent exclusively on the proceedings removed.

2. Where an act of Assembly authorised a rail-road company to "locate and construct" a rail-road, and declared that the "location shall be approved of by the judges of the Court of Quarter Sessions, upon the view of six jurors, to be appointed by said court as directed;" it was held that it was not a valid exception to the proceedings, that the location was made by the jury, nor that there were not two full terms between the appointment of the jury and the confirmation of their report.

3. The regulation of a street in a city or incorporated district is given to the corporation, only for corporate purposes, and is subject to the paramount authority of the state in respect to its general and more extended uses.

4. The provision in the constitution that private property shall not be taken for public use without compensation, does not prohibit the legislature granting to a rail-road company the privilege of laying rails on the streets of a city or town, and of using the rail-road so made.

5. There is nothing in the constitution to prevent the grant of such a monopoly as a rail-road.

THIS was a certiorari to the Court of Quarter Sessions for the County of Philadelphia, to remove the proceedings in the matter of the Philadelphia and Trenton Rail Road Company.

The proceedings in this case were instituted under an act entitled "A further supplement to an act entitled an act authorising the Governor to incorporate the Philadelphia and Trenton Rail Road Company," passed on the 22d of March, 1839; the material provisions of which are as follows:

"SECT. 1.—That the Philadelphia and Trenton Rail Road Company be, and they are hereby authorised, to continue the rail road of said company, in its present location, along Frankford road and Maiden

VOL. VI.—4

street, in the district of Kensington, until the said company conveniently can locate and construct another rail-road upon another rout from their depot in Kensington to their depot at the corner of Third and Willow streets, in the district of Northern Liberties; the said privilege of continuing their road as aforesaid, not to extend longer than one year. And that James Ronaldson, Thomas D. Grover, and Daniel Smith, (carpenter,) be, and they are hereby appointed commissioners to view and examine the said road, and to consider and determine if any damages, and to what amount, any owner of property along the line of the said road in the district of Kensington may sustain; or if any damages, and to what amount the district of Kensington at large may sustain, and ought of right and equity to be paid by reason of said road remaining upon and continuing along the line of Frankford road and Maiden street aforesaid. And upon the award of the commissioners aforesaid, the Philadelphia and Trenton Rail Road Company shall pay to any and all persons, or the corporation of the district of Kensington the full amount of damages awarded by said commissioners, and at such times and such manner as they shall direct: Provided,—That the said company shall not be required to pay damages for a longer period than the time the said road and street shall be occupied by the said rail-road; and the said road and street shall be put in as good condition and order as they were when the said company first laid their rails thereon.

Sect. 2.—And the said Philadelphia and Trenton Rail Road. Company are hereby authorised, as soon as they conveniently can, and they shall within one year, locate and construct a rail-road from their depot in the district of Kensington, to their depot at the corner of Third and Willow streets, in the district of the Northern Liberties by the best rout along the streets between said depots, and for that purpose they may occupy such street or streets as shall be most beneficial and convenient; which location, before the construction of said road, shall be approved of by the judges of the Court of Quarter Sessions, of the County of Philadelphia, upon the view of six disinterested jurors, to be appointed by said court as directed, who, on being applied to, are hereby required to act in the premises; the said rail-road to be on a level with the pavement or surface of the street or streets, and that the said rail-road shall be so constructed as not to form any unnecessary obstructions to the free use and passage of any street or streets in which the same shall be located and constructed; and that in making said location through Kensington and the Northern Liberties aforesaid, regard shall be had to the public business, trade, and private property in and through the same, so that in the making of such location to interfere with and injure as little as possible such said public business, trade, and private property, the said company shall at all times, at their own cost, keep in good condition, and repair so much of all or any streets,

lanes, or roads along which the road may run in and through the said districts, as may be used by said company, so that the passage along and over said rail-road may be safe and convenient."

In pursuance of the provisions of the act, the Court of Quarter Sessions for the County of Philadelphia, on the first day of February, 1840, appointed a jury of six persons to view and locate the road; and ordered that public notice be given of the time and place of meeting of the viewers in two daily newspapers for four days.

On the 11th of February, 1840, the viewers made the following report.

"The undersigned jurors, or viewers appointed by the judges of the Court of Quarter Sessions of the Peace, for the County of Philadelphia, by the order of said court hereunto annexed, met in pursuance of previous notice, on Friday, the seventh day of February instant, at 10 o'clock, A. M., at Evans's Hotel, in George street, near to, and west of Sixth street, and were all duly sworn or affirmed according to law; and then and there W. M. Kennedy, representing the district of the Northern Liberties, and certain individuals, and James Goodman, representing the district of Kensington, discussed before said viewers the construction of the act of Assembly, under which they were appointed, and the duties to be performed by said jurors or viewers under their said appointment; and the said viewers then proceeded to examine the different routes upon which to make a location of the rail-road from the depot of the said Philadelphia and Trenton Rail Road Company, in the district of Kensington, to the depot of the said company at the corner of Third and Willow streets, in the district of the Northern Liberties; and the said examination was made in the presence of William M. Kennedy, the counsel aforesaid, and other persons claiming to be interested in the location of the said rail-road; and the said viewers heard the suggestions and opinions of the persons so attending with regard to the location and the effects thereof, and the said viewers adjourned to meet at Evans's Hotel, in George street, on Monday, the 10th day of February instant, at 7 o'clock, P. M., and at which last mentioned time and place, all the jurors or viewers being present, they heard a further discussion upon the subject of the law, and what was proposed to be proved by William M. Kennedy, on behalf of the districts and persons objecting to the location of the said rail-road; and also having heard the counsel for the said Rail Road Company, the jurors or viewers did not consider that any further examination of witnesses upon the subject of their duties could in any manner aid them in arriving at a proper decision as to the location of the said rail-road; and the said jurors or viewers then adjourned to meet at Evans's Hotel, on the 11th instant, at half past one o'clock, P. M.

And now to wit:—At the time and place last aforesaid, the viewers or jurors all being present, do make the following report to the said court. " Having taken into consideration, and having had regard to the public business, trade and private property in and through the said districts, as well as the best route for the location of the said rail-road along the streets between the said depots, do hereby make the following location under the provisions of the said act.

" Beginning at a point laid down on the annexed plan on the west side of the lot on which the depot of the said company is located, in the district of Kensington, and running south-westerly into Front street above Harrison street, and thence down Front street to Willow street, and thence up Willow street to the depot of the Philadelphia and Trenton Rail Road Company, at the corner of Third and Willow streets, in the district of the Northern Liberties, which said location is represented upon the draft hereunto annexed. In witness whereof we have hereunto subscribed our names, this eleventh day of February, Anno Domini, 1840."

The following exceptions were filed to the report on the part of the holders of property on Front street, and the Commissioners and Inhabitants of the Northern Liberties.

" Exception 1st.—The parties interested, were misled by the said company's calling the jury together in the city, and were hindered access to the said jury in passing along Front street, and from knowing that the said jury were viewing the said route, by their being conducted along said Front street in an omnibus provided by the said company, thereby separating the said jury from the property holders assembled at the corner of Willow and Front streets, and hindering the said parties interested in said route from being heard in the premises before the said jury.

2nd. The jury were guilty of gross misconduct in the performance of their duties.

Spec. 1. They declined hearing the opponents of said road : read sections from the charter of said company, to show the nature of the said road, and the duties of the jury in the premises prior to said view.

2. They entered an omnibus at the corner of Front and Willow streets, provided by said company, leaving a number of the parties assembled there to sustain their interests in the street, thereby withdrawing from the said parties interested, and denying to them access to the said jurors while examining in the said omnibus the said route.

3. The jurors retired from the room in which they were convened on the 10th instant, as announced at the time for the purpose of deliberating upon an application for a postponement or adjourn-

(Philadelphia and Trenton Rail Road Co.)

ment made by W. M. Kennedy, for the purpose of affording an opportunity of procuring depositions touching matters contested, and with the view of avoiding the consumption of time by an examination of the same witnesses upon the same matters, and for the purpose of affording Messrs. Goodman and Ingersoll an opportunity of exhibiting the evidence, and of being heard in behalf of the parties represented by them; and during their said absence as aforesaid, they, the said jury, in the absence of the parties interested, and in denial of their right to be heard by themselves, or their attorneys, and by other proofs and allegations in the premises, wrongfully determined upon all the matters contested in the premises, and returned to the room, when convened, and to the great surprise of the parties interested, and in attendance for the purpose of being heard before said jurors in the premises, announced that the said jurors had determined all matters, and did not wish to hear any of the parties in the premises.

The said jury refused to allow W. M. Kennedy to examine Alderman Mott, John E. Keen, John Manderson, and others, witnesses then present, for the purpose of showing the character of the public travel, business, trade, and the value of private property upon the said street, and upon other streets or routes, and for the purpose of showing the relative effect of the said railroad upon the public travel, trade, and convenience, and upon the value of the private property upon said routes.

The said jury refused to inquire into the extent of the public trade and business, the value of private property, and the manner in which the same are affected by the location of a rail-road upon a public street, and the effects of the said location on Front street, although an offer to examine witnesses, and furnish proof by witnesses then present, was made by different persons representing several interests to the said jurors, in a respectful manner at the said meeting on the 10th instant.

The said jurors prior to viewing the said route, agreed and announced said agreement to meet on the 10th instant, at 7 o'clock, P. M. to hear the parties objecting to the proposed routes, &c. upon the motion of James Goodman; and having convened according to said adjournment, withdrew from the parties interested, assembled to make their objections to said proposed route, and made up their minds as to the course they intended to pursue during the time they were so withdrawn from the said parties interested; and upon returning to said room, announced through the chairman thereof, that they had made up their minds upon the law and subject, and refused to hear the parties interested, their objections to the said proposed route, and their proofs and allegations in the premises, and the views of the said parties upon the acts of Assembly, and

matters involved in the premises, and contested before the said jury.

The said jurors though authorised and required to act in the premises, refused to entertain the claims of the district of the Northern Liberties, and the owners of property on said Front street, for damages for the injury sustained by them in the location of said rail-road upon said Front street.

The said jury in the presence of the said parties, adjourned without naming any time and place to which they stood adjourned on the 10th instant.

The said jury held a meeting on the 11th instant, at Evans's Hotel, in the premises, without giving any notice thereof to the parties interested, in opposition to the said location and rail-road company, of which meeting the said company had notice, and attended by their agents thereat.

The said jury have betrayed on the face of their said report, a consciousness of misconduct, and have sought to anticipate, excuse, and forestall exception thereto, in behalf of the parties aforesaid, interested as aforesaid. Their report is not full, it is partial, and intended to conceal and mitigate misconduct complained of.

3d. The said act of assembly, so far as the same authorizes the location of the said rail-road upon Front street, and Willow street, if any such authority is given therein, is unconstitutional and void.

Spec. 1. It impairs the obligation of contracts between the said Philadelphia and Trenton Rail Road Company, and Kensington district; between said company and the district of the Northern Liberties, and between said company, and the Philadelphia, Trenton, and Northern Liberties Rail Road Company.

It impairs the obligations of the several contracts under which the property holders hold, and have improved their properties upon the said route.

It divests vested rights of property corporeal and incorporeal.

It encumbers private property with a servitude for the private benefit of a private company.

It affords no compensation for damages, and does not take the said private property for public use, but for private use.

The said act, does not make the said rail-road a highway, or provide for the public use thereof, nor is the common use of the said road upon equal and reasonable terms, and toll secured to the public, as a public and common right.

4th. The route located by the said jury is not in pursuance of the directions of the said act of Assembly; it is located through private

property: it is not between said depots, but extends beyond the same at each end thereof.

It intersects Front street, north of the Kensington depot, and extends south of the Northern Liberties depot, and is not between the same.

It is not another rail-road upon another route from their depot in Kensington, to their depot at the corner of Third and Willow streets.

It is not upon the best route along the streets between the said depots.

It greatly damages the property of the districts through which it passes, of the owners of the soil upon which it is located, and cannot be constructed until compensation is made therefor.

The location thereof upon Willow street is a fraudulent pretence upon the part of the company, in fraud of the rights of the district of the Northern Liberties, of the Philadelphia, Trenton and Northern Liberties Rail Road Company, of the public right of highway thereon, and of the written contracts of said company."

The agreements or contracts referred to in the third exception were as follows.

" Articles of agreement had, made, and entered into this twenty-first day of March, a. d. one thousand eight hundred and thirty-nine, between the Commissioners and Inhabitants of Kensington district of the Northern Liberties on the one part, and the Philadelphia and Trenton Rail Road Company of the second part—

Witnesseth, that whereas the Ordinance of the 19th of August, a. d. 1836, by the party of the first part and acceded to and accepted by the party of the second part, has expired, and the party of the second part has been desirous to have and occupy the route of rail-road as now laid down, for a further period of time, and whereas the same has not been considered advantageous to the interests of the said party of the\ first part, but in order to enable the party of the second part to have a continuous line of rail-road, have by a resolution of the board of said party of first part granted permission to said party of the second part to continue as heretofore, the use of said streets on which their rail-road is now made for such further time as they deem fit and proper, viz., the party of the second part, they paying therefor to the party of the first part the annual sum of two thousand dollars, in quarterly payments on the twenty-first days of June, September, December, and March, in each and every year, or at that rate for such period of time as they the party of the second part shall use and occupy for rail-road purposes the same; and in case of non-payment and notice to that effect given to the party of the second part, they, the party of the first part, may

(Philadelphia and Trenton Rail Road Co.)

and can take up said rails at the expiration of ten days thereafter, at the proper cost and charge of the said party of the second part; and all privileges and all restrictions as to the right of travel on the road, as provided for in the ordinance aforesaid, shall continue and remain as heretofore.  Now, therefore, it is mutually agreed, that the party of the second part shall annually pay at the rate of two thousand dollars per annum, for the privileges aforesaid, so long as they shall use the same, and in quarterly payments as aforesaid, if a quarter of a year shall be due, or so much as shall be due; and the party of the first part covenants that all and every of the privileges extended under ordinance of the 19th of August, 1836, be continued during the time of the continuance of these covenants between the parties."

" Articles of agreement made this twenty-third day of October, in the year of our Lord one thousand eight hundred and thirty-nine, between the Northern Liberties and Penn Township Rail Road Com-pany of the first part, and the Philadelphia and Trenton Rail Road Company of the second part—

Witnesseth, That the party of the first part for the consideration hereinafter stated and agreed to be paid by the party of the second part, to the party of the first part, do hereby give and grant unto the said party of the second part, at all times the free use of all that part of the rail-road of the Northern Liberties and Penn Township Rail Road Company from Front street to Third street along Willow street, for the rail-road cars belonging to the said Philadelphia and Trenton Rail Road Company for the transportation of passengers, merchandise, &c., until the 23d day of February, A. D. 1862, and to commence from and immediately after the determination of the contract which now exists, between the said two companies for the use of the said road, subject to such rules and regulations as the Board of Managers of the party of the first part may adopt for the general government of the said rail-road, not inconsistent with the rights hereby granted to the party of the second part.  And the party of the first part further agree that they will keep that part of their rail-road from Front to Third street along Willow street, which is embraced within this contract, in good repair, and at all times to correspond with the construction and superstructure of the Philadelphia and Trenton Rail Road as the same is or may hereafter be made, as may be necessary to the connection of the said roads, so that the union of the two roads at the corner of Front and Willow streets may form a continuous track of rail-road from the depot of the Philadelphia and Trenton Rail Road Company in Kensington to their depot at the corner of Third and Willow streets.  And should it be required at any future period that the Philadelphia and Trenton Rail Road Company should lay a track on a wider superstructure than the width which is now used, so as to correspond with the line

of rail-road between Trenton and Jersey city. It is agreed that in such case the said Philadelphia and Trenton Rail Road Company shall have the right to make such alterations as they may desire at their own expense, in the width of that part of the Northern Liberties and Penn Township Rail Road embraced in this contract. Provided said alterations if made shall not in any way interfere with the free passage of cars built according to the regulations of the Canal Commissioners for the Philadelphia and Columbia Rail Road on and over said Northern Liberties and Penn Township Rail Road. And the Philadelphia and Trenton Rail Road Company, the party of the second part, hereby covenant and agree to pay to the Northern Liberties and Penn Township Rail Road Company, the party of the first part, for the use of the said rail-road the sum of five hundred dollars each and every year during the continuance of said contract, and the said payment to be made quarterly, the first quarter to be paid three months after the determination of the agreement now existing, and quarterly thereafter. And it is further agreed by and between the said parties hereto, that if the rail-road of the Philadelphia and Trenton Rail Road Company shall not be located and constructed under the provisions of the act of the General Assembly of Pennsylvania passed the 23d day of March, in the year of our Lord, 1839, from their depot in Kensington to their depot at the corner of Third and Willow streets, along Front street to Willow street, then and in that case the contract shall cease and determine and be of no force and effect, anything herein contained to the contrary notwithstanding."

Depositions were taken in support of and in opposition to the exceptions relating to the proceedings of the jury; and after argument the Court of Quarter Sessions dismissed the exceptions and confirmed the report.

The case was then removed to this court by certiorari; and the following exceptions were filed.

" 1. The said jury were appointed without any authorised application by the Philadelphia and Trenton Rail Road Company, and without the knowledge or consent of the said company or the directors thereof.

2. The court erred in appointing said jury to view and locate a railroad under the provisions of the said act, &c.

3. The jurors were not sworn by the court, nor by authority from the court, nor in the terms prescribed by law.

4. The parties interested were misled by the advertisement calling the jury together in the city.

5. The jury were guilty of misconduct, in not hearing the owners

Vol. vi.—5

of property upon Front street, their proofs and allegations upon the matters before them.

6. In refusing to hear evidence of the injurious effects of said rail-road to private property, to public business and trade upon the said street.

7. In refusing to entertain or consider the claims of private property holders for damages for the injuries done them by the said location and construction of said rail-road.

8. The court erred in ruling that the said appointment of the said viewers, their report and proceedings, &c., were to December and not to March term, and in refusing time to prepare to resist said application.

9. The route located is not pursuant to the acts of Assembly, &c., but is contrary thereto.

It is without the consent of said Districts.

It is not upon streets between said depots.

It is not another rail-road, upon another route.

It extends beyond and is not upon streets between said depots.

It is partly upon private property.

It is in part upon the track of the rail-road laid down under agreement within the district of the Northern Liberties.

It is partly upon the track of the Northern Liberties and Penn Township rail-road upon Willow street.

10. The act of the 23d March, 1839, authorising the said rail-road, has not been accepted or carried into effect by the said company, but has been waived by a contract with the Kensington district, and is void—Because, it impairs the obligations of contracts; to wit—the charters of the said Districts—

Of the contracts made with the said company with each of the said districts—

Of the contracts made by the said company with the Northern Liberties and Penn Township Rail Road Company—

Of the several contracts under which the said street and right of passage thereon has been assured to the owners thereon and thereof.

It does not provide compensation for the injury done and recognised as the effect thereof in the said act.

It gives a monopoly of the said highway or streets to the said company, and abridges the common highway and the private and public right of passage thereon.

Because the said rail-road company is in effect a monopoly in law, and in fact has monopolised to the sole use and benefit of the said company (in denial of the public right to use the same as a highway) the uses of the said rail-road.

(Philadelphia and Trenton Rail Road Co.)

It invades, impairs, and destroys the public and private uses of the said street, and hinders and obstructs the same.

It is adding new uses to those of the said highway, in abridgment of vested rights, and in violation of the trust under which the said highway is held.

The judges of the Quarter Sessions did not all convene and approve, after deliberation, of the said location, as they ought to have done; the associate judges of the said court only having acted therein."

Mr. *Kennedy* and Mr. *J. R. Ingersoll*, in support of the exceptions, argued—

That Front street was opened under proceedings in partition, and became the property of the owners (parties to the said partition) of the lots bounding upon it in severalty, subject to the full, free and uninterrupted right, liberty, privilege and use thereof by the said parties, their heirs and assigns. That the present owners, assignees of the parties to the said partition, were clothed with the same rights to the soil, and to the use of the said street, by virtue of their private titles. That the opening of Front street as a public street, did not destroy the private rights of soil, or of way, which would still remain, though the public street were vacated. 16 *Mass.* 35. That the state could not incumber the soil of a highway, and qualify the common right of way by a special grant to an individual or company, for canal or rail-road purposes. That the rights of the owners were only incumbered by the stipulations of the partition and the public right of way, and comprehended a right to exclude the taking of the soil for the private uses of an individual or company. That such right of exclusion was incident to, and a part of their property in the lands; and is as effective against the state, without compensation, as against individuals; and particularly where the state does not take for a public road, but authorises individuals to take for their own purposes. That the right to the soil of Front street was out of the state; so that of way upon it; and the right thereof was a right of property preserved to the grantee by the constitution, as vested rights, could not be divested by a state law without compensation. 9 *Cranch*, 87. 1 *Kent's Com.* 413. 2 *Dall.* 304. That a grant is not the less a contract because no beneficial interest passes, or though it be of a mere franchise. It is still a contract, and imports property. 1 *Kent's Com.* 47. That the contract granting the soil of the street to the assignees of the parties to the partition, is impaired by the imposition of an additional servitude in favour of a stranger. To grant to that stranger the exclusive right to the street, would be alike to annul their title to the soil of the street, and to the private as well as public right of way upon it; to hinder them from the enjoyment of these, is to deny their right of property therein: to deny to the owner the exercise of the rights of property found in his grant, is to take from him his property; a partial

(Philadelphia and Trenton Rail Road Co.)

taking differing from an entire taking only in degree. The authority to the company takes from the owners the right to treat the company as trespassers, which appertained to them as owners of the street; and to treat the rail-road obstruction as a nuisance: the suppression of these rights is a taking of their property; an abridgment of the right of property is a taking of it.

Property consists as well in the right to exclude others from using the thing, as in the right to use it. To take from the owners a right to exclude the company from the use of the street for a canal or railroad, is taking from them the right to the free and uninterrupted use of the street secured by their respective deeds, and so far impairs the obligation of contracts, &c.

The state, at best, is but a trustee of a public highway. She has not a transferrible property in the soil or way. She is bound to preserve and protect the uses, to guard and preserve the highway, according to the terms of the concession. 2 *Hil. Dig.* 95. 2 *B. & A.* 793. 1 *Baldwin,* 230. 16 *Mass.* 35, 6. 7. The state may claim property for state roads, not to give to individuals. 1 *Penn. Rep.* 465. A dedication for the purpose of a street will not authorise the conversion of the street into a canal without compensation. A dedication of ground for a public footway vests in the king or state as trustee. They cannot declare it a common thoroughfare or highway without violating the trust, nor without recompense. The right of the public is a right of passage only, and that too upon the private soil of another. The king's right of soil, or the public's right of soil, is a thing unknown to the law of highway. The owner retains all right of soil, of herbage, of minerals, and use of the land, not incompatible with the public right of passage. The right of erecting vaults under our streets springs from this source. 9 *Serg. & Rawle,* 31. 3 *Watts,* 219. *Swift Dig.* 106. 3 *Kent's Com.* 2 *Stra.* 1004. 16 *Mass.* 35, 6, 7. The state has violated the trust and confidence reposed in it, by abridging the right of the owners, by the authority given to individuals; and the constitution, by not stipulating that compensation be first made. The state cannot twice grant the same thing, or produce adverse titles to the same thing in distinct grants. 10 *Peters,* 700. 4 *Gill & John.* 134. The grant of the act of incorporation stipulates for numerous and onerous duties, consisting of expenditures of money for the public convenience, which constitutes a good consideration for the grant, and establishes it as a contract. By the charter the authority of the state over the streets is vested in the commissioners of the districts. *Barter* v. *Com.* (3 *Penn. Rep.* 363.) They have directed this street to be improved at an expense exceeding $30,000—by the adjoining owners; the whole of which the state have authorised the company to take to their own use. The state cannot revoke or rescind the contract with the district, nor give the improvements thus made to individuals, or qualify the rights of the owners to the same.

(Philadelphia and Trenton Rail Road Co.)

The state cannot as trustee reject the trust, without the express consent of the parties in interest, or declare new uses against their consent, of a highway granted to the state for the purpose of being kept as a common highway. Chancery will interfere to prevent ground dedicated to specific uses from being otherwise appropriated. 6 *Peters*, 513. 10 *Peters*, 729. The corporations have the right to insist upon the preservation of their streets, unmodified in form, unqualified in character. 18th, 21st and 26th sect. of Act of In. Ken. Dis. 7 *Sm. L.* 183. The inhabitants of Kensington have been compelled to improve the streets by force of the stipulations of the charter. The state should be enforced to accord to them the advantages of those improvements, if not expressly, by implication granted them, in the charter. The state cannot incorporate individuals against their consent as public or private corporations; the act to incorporate takes effect from acceptance. 1 *Kent,* 419. *Angel on Corp.* 46, 7. 4 *G. & J.* 129, 30. *Hil. Dig.* 94. 98. 100. Acceptance gives to an act of incorporation its efficacy. The powers of the corporation are as much fed from the powers of the corporators as of the state; and the state is as much bound by the act as the inhabitants. Neither can revoke, cancel, rescind or annul any part, except as the power of doing so is provided for in the charter. The right of the district to the improvements and streets made under the charter cannot be abridged. Their right to exclude the rail-road cannot be taken from it and given to the company. The franchise of the district in the streets is protected by the constitution. 1 *Kent,* 415. 2 *Wharton's Rep.* 485. What is granted to a corporation cannot be resumed. 11 *Peters,* 566, 7, 8, 9. 4 *Wheaton,* 658. 2 *Mass.* 143. 4 *G. & J.* 109. 134. 146-8. The charters give a general power over the streets. 3 *Penn. Rep.* 253. 10 *Peters,* 729. 6 *Peters,* 513. The act of 1839, creating the authority, recognises the injury. It provides for compensation for a temporary use. It makes no provision for a perpetual use by the company. The omission is fatal under the amended constitution. The charters stipulate that no law or ordinance shall be made to alter the regulation of the street. Act 17th April, 1795. Sec. 11. 21. 30. 33. 16, 17, 18, of Act of Incorporation of Kensington. The implication is irresistible, that no use shall be made of them against the consent of the corporation, that requires an alteration of the regulation of them. A grant of them is implied so far as that they shall not be altered by any law in form or use. The result of the location will be, that the street can only be used in such way as will not interfere with the company. The private right of a full and free use of the street, and the common right of an equal use of it are destroyed. This is the effect of that law; and there is no difference in principle between a law that in terms impairs a contract, and one that produces the same effect in construction and practical result. 4 *Harris & Johnson,* 109. *Baldwin,* 215-20.

(Philadelphia and Trenton Rail Road Co.)

Mr. *Mallery* and Mr. *Meredith* for the company, argued—

That the *first* exception was not well founded. That the application to the Court of Quarter Sessions for the appointment of viewers, was by petition signed by the president of the company; and that when the reports of the previous viewers were set aside, the court on the application. of the solicitor of the company, appointed the third set of viewers, and it was not necessary to present a new petition. The petition was not rejected by setting aside the report. The company have, in every stage of the controversy, claimed the benefit of the proceedings had under the appointment, and now claim; which is sufficient evidence of authority from the company.

The persons objecting to the location of the road cannot be injured by any matter alleged in the second exception. Whether the location was made by the company, in the first place, and that location, submitted to the jury for their approval; or made by the jury upon a view of the ground, and the location returned by them, with their approval, cannot be material. The company were authorised to make the location, and they might do it by the direct agency of the jury, as well as in any other manner. And the location having been so made and adopted by the company, it becomes their location, and it has been approved and sanctioned by the jury and by the court.

There is nothing upon the record to sustain the third error. It appears that the jurors were sworn according to law; but there has been no law shown which requires them to be sworn at all, in the present case; and no form of oath, or any tribunal named, before whom any oath is to be taken. If no oath was required, it cannot be an error that they were sworn.

[The fourth, fifth, and sixth errors were passed, upon the suggestion of the court, that they contained nothing, which could be examined in this court upon this certiorari.]

The seventh error, if true in point of fact, is not a ground of complaint here. The jury were to view themselves: they were to exercise their own judgment: they were not constituted a court, to call witnesses before them, administer an oath to them, and decide upon their testimony. They are to examine and judge for themselves, and not depend upon the judgment of others. And besides, there is nothing in the act requiring them to decide upon the claims of private property holders for damages. No such provision is found in said act. The company, in the location of the road in question, can only use some street or streets between the two given points; they cannot take private property.

The provisions of the previous acts, relating to this company, can have no bearing upon the provisions of the present act. Under the former laws, the company, in the location of their rail-road, were excluded from the use of all highways, except it should be necessary for crossing the same; and were required to pay for the land used

to the owner thereof; and the mode of ascertaining the value of the land, and the damage to the owner, is pointed out. But by the act of the 23d of March, 1839, the company are authorised to locate and construct a rail-road, from their depot in the district of Kensington to their depot at the corner of Third and Willow streets, by the *best route* along the streets between the said depots, and for that purpose they may occupy such street or streets as shall be most beneficial and convenient.

It was not within the contemplation of the legislature that the company should make any location, except in the streets; and they are not required to pay any one for that privilege.

The eighth error is founded upon the supposition that the proceedings in this case are to be regulated by the practice in laying out roads under the general road law.

But by a reference to the act of the 23d of March, 1839, under which the proceedings in this case were had, it will be manifest that the practice under the general road law, cannot be adopted.

The location and construction of the road are required to be done within one year; and if two terms were to be allowed for the confirmation of the report of viewers, and one or two should be set aside as in the present case, the law would be entirely defeated.

The company require only the report of the viewers and the approval of it, by the court. They need no *order* of the court to warrant the location or construction of the road, as in the case of proceedings under the general road law.

[The ninth error was passed as containing no matter of review in this court.]

The tenth error, and the specifications under it, strike at the validity of the act, upon the ground that it is unconstitutional, and therefore void. In the first it is objected to the act that it is unconstitutional because it violates the charter of incorporation of Kensington district, in depriving the corporation of the power of the streets.

But upon examining the acts incorporating the district, it will appear that the streets in the said district are public highways, and are in the same situation as other highways throughout the commonwealth. Pamphlet Laws of 1819, 1820, p. 54.

The legislature have the same power over the streets of Kensington as they have over the highways in other parts of the state, to regulate the use of them, and to authorise any improved mode of travelling upon them. And there is nothing given to the corporation of that district, which can limit the power of the legislature over the streets, or render an act of the legislature upon that subject unconstitutional.

It is said again that the authority given by this act to locate the rail-road along the streets, is unconstitutional, inasmuch as it takes private property for public use, without making compensation to the

owner.   This is assuming that private property is taken for the use of the rail-road which is denied.

The streets have already been dedicated to public use, and the former owner of the soil has parted with his control over it so long as it shall be used by the public.   The use, and the manner of using it, have been surrendered to the public, and are under the control of the legislature, as the guardians of the public.   And by the act it is only the occupancy of the streets which is given, and only that can be taken—and that belonged to the public; and the public, by an act of the legislature, have given it to the company.   And it is not possible for any constitutional question to arise from this part of the case, even admitting that the right of soil in the street may be in the owners of the adjacent land.   But if the owner of the land lays out a town, or a part of one, and opens streets, and dedicates the streets to public use, and then sells out lots, bounded upon the the streets, with the courses and distances, it may be doubted whether the owner of the lots can extend his claim of title to the middle of the street.   *Tyler* v. *Hammond*, (11 *Pick. Rep.* 193.) *Jackson* v. *Hathaway*, (15 *John. Rep.* 447.)

But so far as the use of the public highways is concerned, the legislature have always exercised control over them, and have modified and varied the use of them.   They have authorised a turnpike road to be laid upon a common road; a rail-road to be laid across highways and turnpike roads, and canals intersecting all of them; and it never would be allowed by the legislature, regarding the best interests of the public, that any or all her lines of improvements should be interrupted and broken, by every street that should fall in the way, and by every petty corporation that should lie in the direction of her improvements.

In no sense can the act impair the contracts existing between the rail-road company and the districts.   The contract with the district of Kensington for the use of the former location of the road, and to pay a certain sum, while they use the same, and if they cease to occupy the street, the contract to be at an end, cannot be said to be impaired by the company ceasing to use that under an act to construct another road, any more than without an act or without any other road; nor is there any other contract in existence which can in any manner be impaired or affected by the act of assembly in question.

And in reply to the last error assigned, it is sufficient to say that the judges of the Court of Quarter Sessions of the County of Philadelphia, are referred to, in the act, with reference to the judicial character in which they were to act.   And acting in a public and judicial character, it required the attendance of no greater number than would legally constitute a quorum.   By article 5, sec. 7, of the constitution of Pennsylvania, the judges of the Court of Common

Pleas of each county, any two of whom shall be a quorum, shall compose the Court of Quarter Sessions of the peace.

It is enacted by the act of 1802, that *the justices* of the Court of Quarter Sessions in each county, on petition, may grant views of roads, &c., and it never has been doubted but two might legally act. *Purdon*, ed. 1830, p. 792.    5 *Binn.* 481.    6 *Serg. & Rawle*, 170.

The opinion of the court was delivered by

Gibson, C. J.—A certiorari lies in all judicial proceedings in which a writ of error does not lie; and being a substitute for a writ of error, it is governed by the same, or strictly analogous, principles: consequently no point can be raised on it which is not apparent exclusively in the proceedings removed by it.    Though not peculiar to road cases, this principle was enforced in the case of the *Schuylkill Falls Road*, (2 *Binney*, 250;) of *Penn's Grove and Concord Road*, (4 *Yeates*, 372;) and of *Spring Garden street*, (4 *Rawle*, 194:) in all which this court refused to enter into the merits, or to decide facts on depositions.    One exception alone has been made to it.    In the *Case of the Baltimore Turnpike*, (5 *Binney*, 484,) evidence was heard in *support* of the proceedings on a point which perhaps did not need it; as all presumptions favourable to regularity may be made in consistence with the record.    The exceptions in the case before us, have been framed in disregard of the general rule.    In the twenty-six points raised by them, I discern few that are legitimate subjects of re-examination; and as we sit here, not to settle abstract principles, but to determine matters which lie in the course of our functions, my first business will be to cast out such of them as are not determinable here.

It is obvious that the fourth, fifth and sixth exceptions, and also the ninth, with its eight specifications, belong to the rejected class. The supposed misleading of parties by the advertisement; the alleged misconduct of the jury in refusing to hear the owners of property and their witnesses in support of their objections and claim to damages; are matters that do not appear by the record: by reason of which, even were there substance in them, we would be compelled to dismiss them.    We do not find, however, that the act by which the proceeding was directed, authorised the jury, or any one else, to assess damages; and objections to the route on the ground of policy or convenience, they were to determine, not on the testimony of witnesses, but on their own view, as was decided in *Johnson's case*, (2 *Wharton's Rep.* 277.)    The judges of the Quarter Sessions, as they had not viewed, might indeed have satisfied themselves of the propriety of the location by the information of others; but that they were satisfied without it, is not ground of error examinable here.    The ninth exception, also, with its specifications, by which is alleged that the reported route agrees not with the directions of the

(Philadelphia and Trenton Rail Road Co.)

act, depends on facts of which we judicially know nothing; nor would they perhaps avail the exceptants if they were properly before us. We perceive not that the act requires the assent of the districts to the location; nor did it appear on the diagram exhibited at the argument that the road is not laid upon streets between the depots; and that it is not another rail-road upon another route; or that it is partly on private property. It may, as alleged, be partly on the track laid down under an agreement with the district of the Northern Liberties; but what of that? A part of that track may, notwithstanding, be on " the best route along the streets between the said depots;" and the act requires no more. As to its being laid on the track of the Northern Liberties and Penn Township Rail Road, the interference might be made a subject of complaint by that company, but certainly by no one else; and the complaint could be heard only by the court below, no other tribunal having power to investigate the fact.

The same remarks may be applied to three specifications of the allegation contained in the tenth exception. Of contracts made by the company with the exceptants or the Northern Liberties and Penn Township Rail Road Company, we judicially know nothing; and we cannot test the constitutionality of the statute by an allegation of matters which cannot legitimately appear in the proceedings or in our paper books. From the copies furnished, they appear to be contracts for privileges purchased in other streets; and the law does not disturb them. If they bound the company originally, they bind it still, and the parties may still have an action for any breach of the company's engagements. None of these matters, however, are subjects of revision by us; and I turn to those which properly belong to us, premising that most of them may be despatched in a few words.

The first exception—that the jury of view was not appointed pursuant to an authorised application by the company—seems not to be founded in fact. They were appointed on the motion of the company's solicitor; and were it not so, the manner of the appointment is a matter to which the exceptants cannot make objection, since the company's ratification of the appointment by claiming under it, is equivalent to a precedent authority.

The second is, that the road was located by the jury instead of the company. In the act it is said that the company shall locate, and that the court may approve on a jury's report; but how the inhabitants could be prejudiced by allowing the act of location to be performed by the jury instead of the company's officers, has not been shown. It is not to be credited that the jury would be less disinterested and regardful of " the public business, trade, and private property" of the inhabitants, than the company itself would be. It was the privilege of the company to make the location by its officers; and in surrendering it to the jury it renounced a benefit

provided for it, which a common law maxim too trite to be repeated, authorised it to do. Even were that not so, the jury might be considered as its agent, having made the location by its direction, as evidenced by its subsequent ratification of the act. The question before the court, however, regarded not the paternity of the location but the propriety of it. Not only the court, but the jury were to be satisfied of the propriety of the latter; and it is not probable that the jury would have been as well satisfied with the propriety of any other, as with their own. The exception at best depends on a literal interpretation; and it is not to be favoured.

The third is, that the jury were not sworn by the authority of the court, or in the terms prescribed by the law. What terms? The act itself prescribed none: nor did it direct the jurors to be sworn at all. And yet it is stated in the report that they were sworn or affirmed according to law; and as nothing in the record contradicts it, we are to take it as it is stated. It was provided that the jury should be appointed " as directed "—and here the sentence was left incomplete by the omission of something intended to have been subjoined; but what that was, cannot be conjectured. In the case of *Adelphi Street*, (2 *Wharton's Rep.* 176,) a proceeding to vacate a street, was held to be within the purview of a preceding section to vacate a particular alley, which was directed to be in the usual manner; and this on the ground that there were general principles of practice in laying out and vacating streets, to which the legislature must have referred. That practice, however, has no relation to the proceeding before us which is *sui generis.* That it was not intended to be regulated by the road law, is clear from the fact that no petition for a view was required; nor was there to be an order to view, because the jury were to act on being applied to, and consequently without a particular mandate. As then no oath was prescribed, it is not necessary that the jurors should have been sworn at all; and this disposes also of the eighth exception that the court had not allowed, in conformity to the general road law, two full terms betwixt the appointment of the jury and the confirmation of their report.

The remaining exception is more important, because it calls in question, for specific reasons, the validity of the statute which is the foundation of the proceeding, and which is said to be unconstitutional because it impairs the obligation of contracts; by violating the chartered rights of the districts of Spring Garden and the Northern Liberties; by violating the contract under which the right of passage is assured to the inhabitants of this particular street; by taking the property of the street without compensation to the districts or individual proprietors; and by monopolising the street in derogation of the public and private uses to which it had been applied. This, perhaps, is the substance of all these multifarious specifications.

What is the dominion of the public over such a street? In Eng-

land, a highway is the property of the king as *parens patriæ,* or universal trustee; in Pennsylvania, it is the property of the people, not of a particular district, but of the whole state; who, constituting as they do the legitimate sovereign, may dispose of it by their representatives, and at their pleasure. Highways, therefore, being universally the property of the state, are subject to its absolute direction and control. An exclusive right of ferriage across a navigable stream, which is a public highway, is grantable only by it; and the navigation of the stream may be impeded or broken up by it at its pleasure. In the construction of her system of improvements, Pennsylvania has acted on this principle. Her dams across her principal rivers to feed her canals, have injured if they have not destroyed the descending navigation by the natural channels; and this without a suspicion of want of constitutional power. The right of passage by land or by water, is a franchise which she holds in trust for all her citizens, but over which she holds despotic sway, the remedy for an abuse of it being a change of rulers and a consequent change of the law. No person, natural or corporate, has an exclusive interest in the trust, unless she has granted it to him. Her right extends even to the soil, being an equivalent for the six per cent. thrown into every public grant as compensation for what may be reclaimed for roads; and she has acted on the basis of it; for though damages for special injuries to improvements have been allowed by the general road laws, nothing has been given for the use of the ground. This principle was broadly asserted in the *Commonwealth* v. *Fisher,* (1 *Penns. Rep.* 466.)

Such being a highway as a subject of legislative authority, in what respect is a street in an incorporated town to be distinguished from it? A municipal corporation is a separate community; and hence a notion that it stands in relation to its streets as the state stands in relation to the highways of its territory. That would make it sovereign within its precincts—a consequence not to be pretended. The owner of a town plot lays out his streets as he sees fit, or the owner of ground in an incorporated town, dedicates it to public use as a street; but it follows not that the dominion of the state is not instantly attached to it. The general road law extends to every incorporated town from which it is not excluded by provision of the charter; and the statute book is full of special acts for opening, widening, altering, or vacating streets and alleys in Philadelphia and our other cities. Were it not for the universality of the public sovereignty, the public lines of communication, by rail-roads and canals, might be cut by the authority of every petty borough through which they pass; a doctrine to which Pennsylvania cannot submit, and which it would be dangerous to urge. It would be strange, therefore, were the streets of an incorporated town, not public highways, subject perhaps to corporate regulation for purposes of grading, curbing, and paving; but subject also to the paramount

authority of the legislature in the regulation of their use by car-
riages, rail-cars, or means of locomotion yet to be invented, and this
without distinction between the inhabitants and their fellow-citizens
elsewhere. The doctrine was carried to its extent in *Rung* v. *Sho-
enberger*, (2 *Watts*, 23,) in which it was affirmed that, though a city
has a qualified property in its public squares, it holds them as a
trustee for the public for whose use the ground was originally left
open; and that the enjoyment of them is equally free to all the in-
habitants of the commonwealth, subject to regulations not inconsist-
ent with the grant. In *Barter* v. *The Commonwealth*, (3 *Penns. Rep.*
259,) it was inadvertently said that the title to the soil of a street is
in the corporation, whose right to improve it for purposes which
conduce to the public enjoyment of it, is exclusive and paramount
to the right of an inhabitant. The point was only incidentally in-
volved, and consequently not very particularly considered; but the
question of title, involving as it has done, no more than the bounds
of the grant, has lain between the grantor and the grantee, or those
deriving title from them. In no case has title been claimed by the
corporation. In the *Union Burial Ground Company* v. *Robinson,*
(5 *Whart.* 18,) in which the point was elaborately argued, the con-
test was betwixt the grantor and a purchaser from the grantee; and
though the cause was eventually decided on another ground, the
court inclined to think, on the authority of many decisions, that the
title to the street, even had it been opened, would have remained in
the grantor; and such appears to be the principle of *Kirkham* v.
*Sharp*, (1 *Whart. Rep.* 323.) The legal title to the ground, there-
fore, remains in him who owned it before the street was laid out;
but even that is an immaterial consideration; for an adverse right
of soil could not impair the public right of way over it, or prevent
the legislature from modifying, abridging, or enlarging its use,
whether the title were in the corporation or a stranger. I take it
then that the regulation of a street is given to a corporation only for
corporate purposes, and subject to the paramount authority of the
state in respect to its general and more extended uses; and that
there would have been no invasion of chartered rights in this in-
stance, even did either of these districts stand in a relation to the
public, which would impart to its charter the qualities of a compact.

What then is the interest of an individual inhabitant as a subject
of compensation under the constitutional injunction that private pro-
perty be not taken by a corporation for public use without it? Even
agreeing that his ground extends to the middle of the street, the
public have a right of way over it. Neither the part used for the
street, nor the part occupied by himself, is taken away from him;
and as it was dedicated to public use without restriction, he is not
within the benefit of the constitutional prohibition, which extends not
to matters of mere annoyance. The injury of which he can com-
plain, is not direct but consequential. It consists either in an ob-

struction of his right of passage, which is personal; or *in* a depreciation of his property by decreasing the enjoyment of it: but no part of it is taken from him and acquired by the company. The prohibition, even when it precluded a seizure of private property immediately by the state, was not largely interpreted, nor was there reason that it should be, as ample compensation was obtained from her sense of justice without it. The sufferers were overpaid, and this sort of aggression was always courted as a favour. But though she usually compensated consequential damage, it was of favour, not of right. Nor did she always make such compensation. In one well known instance, she destroyed a ferry by cutting off access to the shore, without provision for the sufferer; and in the *Commonwealth* v. *Richter*, (1 *Penns. Rep.* 467,) damages were unavailingly claimed from her for flooding a spring by a dam. The clause in the amended constitution which narrows the former prohibition to a taking of private property for a public use by a corporation, is to receive the same construction; the word 'taking' being interpreted to mean, taking the property altogether; not a consequential injury to it which is no taking at all. For compensation of the latter, the citizen must depend on the forecast and justice of the legislature.

On the subject of the next specification, it seems scarcely necessary to say that monopolies are not prohibited by the constitution; and that to abolish them, would destroy many of our most useful institutions. Every grant of privileges so far as it goes, is exclusive; and every exclusive privilege is a monopoly. Not only is every rail-road, turnpike, or canal such, but every bank, college, hospital, asylum, or church, is a monopoly; and the ten thousand beneficial societies incorporated by the executive on the certificates of their legality, by the attorney general and judges of the Supreme Court, are all monopolies. Nor does it seem more necessary to remark, on the subject of the concluding specifications, of exception to the confirmation of the report by the associate judges of the sessions alone, that the approval was an act of the court; and that they were competent to hold it.

Proceedings affirmed.