Sunbury & Erie Railroad Company *versus* Hummell. $\begin{array}{cc} 27 & 99 \\ 34 \text{ SC} & ^3518 \end{array}$

· Railroad Companies are liable at common law for the damage, done by fire, occasioned by the negligent management of their locomotive engines ; and for the risk of such damage, no compensation can be allowed at the taking of the land for the construction of the road.

The risk of damage by fire from locomotives, to buildings erected or to be erected on land over which the railroad passes, is not the subject of compensation and assessment by the viewers appointed to assess "the damages sustained or that may be sustained," by the owner of the land.

For injury accruing to an individual by the proper and ordinary use of a railroad, no damages can be recovered, either under a report of viewers as prospective damages, or by a common law action after the injury occurs.

ERROR to the Court of Common Pleas of *Northumberland county.*

On the 9th of August, 1855, the plaintiff, Benjamin Hummell, presented his petition to the Court of Common Pleas of Northumberland county, praying the appointment of viewers to assess the damages sustained by him, from the location of the Sunbury and Erie Railroad through his land situate in Point township, Northumberland county. The viewers were appointed and on the 22d of October, 1855, made a report, in which the damages were assessed, and stated as follows.

"For the aforesaid quantity of said tract of land so taken and occupied as aforesaid, the sum of one hundred dollars per acre.

"For fencing and keeping up the fence along said railroad, the sum of one dollar and fifty cents per rod.

"For cutting and borrowing ground out of, and injuring fields by railroad, one hundred and fifty dollars.

"Including damages for grass and grain and hauling through with teams, materials for the construction of said railroad, the sum of one hundred and fifty dollars.

"For damages that may be done to the buildings of said farm, from fires arising from the use of locomotive engines on the said road by the said company, or their servants or agents, in the ordinary use of their said railroad, excluding all damages by fires arising from the carelessness, negligence, or wilfulness of the said company, or their servants or agents, in the use of locomotive engines on their said railroad (it being for barn), the sum of one thousand dollars.

"Which several sums together amount to sixteen hundred and eighty-seven dollars and twelve and one-half cents.

"We find the above several sums to be payable to Benjamin Hummel, the said petitioner, as owner of said land and premises."

The supplement to the Sunbury and Erie Railroad charter,

approved the 27th day of March, 1852, provides that the viewers "having viewed the premises, shall estimate and determine the quantity, quality, and value of said lands so taken or occupied, or to be taken or occupied or the materials used or taken away, as the case may be, and having a due regard to, and make just allowance for the advantages which may have resulted, or which may result, to the owner or owners of said lands or materials, in consequence of the opening or making of said railroad, or the construction of the works connected therewith.    And after having made a fair and just comparison of said *advantages or disadvantages*, they shall estimate and determine whether any, and if any, what amount of damages have been sustained, *or may be sustained*, and to whom payable."

The defendants filed the following exceptions to the report of the viewers.

The sum of $100 per acre for the land stated in report to be second rate, is extravagant.

The viewers have allowed $1.50 per rod for fencing, but have not stated the number of perches to be fenced, which is uncertain.

The viewers have allowed $1000 for damages which might happen from fire to the barn, which has not yet been injured, and never may be from fire from locomotives.    It is prospective and illegal.

The viewers have allowed damages to the amount of $1687.12½, which is excessive; and they have not designated all the items with the amount allowed on each, to constitute the aggregate amount.

The court below (JORDAN, P. J.) delivered the following opinion, and entered judgment on the report.

"In the case of Yeiser *v.* The Reading Railroad Company, reported in 8 *Barr* 366, Justice ROGERS, who delivered the opinion of the court, says: 'The jury are directed to give the owner compensation, not only according to quality and quantity of the land occupied by the road, but also damages are to be given for every inconvenience likely to result to the owner therefrom. Can it be denied,' the learned judge continues, 'that it embraces probable damages from fires, caused by the necessary emission of sparks from the engine, to be used in doing the business of the road?'    The words of the act incorporating the Reading Railroad Company are that the jury are directed, after being sworn or affirmed, to view the premises, and to estimate the quality and quantity of the land occupied by the road, and all other inconvenience which may be likely to result to the owner or owners of the land, paying a just regard to the advantages which may seem likely to result to the owners therefrom.    The words of the Act of 19th of February, 1849, under which Hummell proceeded, are: 'The said viewers having been first duly sworn or affirmed, faith-

[Sunbury and Erie Railroad Company *v.* Hummell.]

fully, justly, and impartially to decide, and true report make concerning all matters and things to be submitted to them, and in relation to which they are authorized to inquire in pursuance of the provisions of this act, and having viewed the premises, shall estimate and determine the quantity, quality, and value of the said lands só taken or occupied, or which is to be so taken or occupied, or the materials so used or taken away, and having a due regard to, and making just allowance for the advantages which may have resulted, or which may seem likely to result to the owner or owners of said lands or materials in consequence of the making of the said railroad, and of the construction of works in connexion therewith; and after having made a fair and just comparison of said advantages and disadvantages, they shall estimate and determine whether any, and if any, what amount of damage has been or may be sustained,' &c.

"The difference of the phraseology of these two acts does not warrant a different conclusion as to the meaning and intention of the legislature; indeed there can be no doubt as to their intention. Damages are to be awarded by the Act of 19th February, 1849, for injuries that have been, or may be sustained.

"The propriety of allowing damages for injuries to property that may never occur, is not to be considered by the court; if it were, it would not be difficult to furnish various reasons why the court would not adopt it. With the act before us, admitting of no diversity of opinion as to its meaning, all we have to do is to give the party the benefit of it, unless it be in a case where manifest injustice has been done to the company by the jury, in estimating the damage. In a majority of cases, the court has no doubt, the property through which a railroad passes is enhanced in value, although in the use of the property by the owner he may encounter some additional inconvenience. The inconveniences are seldom equal to the advantages derived from the construction of the road. Justice ROGERS, in the opinion already referred to, says: 'Generally speaking, as we all know, the owners of land through which any public road passes, have but very little reason to complain. They are usually benefited to double the amount of injury.'

"Courts, in the selection of viewers, endeavour to obtain men of correct judgment—impartial and likely to do justice. They view the premises for themselves; here are the opinions of men having a knowledge of the property taken, and that may be injured; and having made their report, the court will not set them aside, because the viewers have estimated the damages higher than the court would have done. To require viewers to adopt the standard the court might fix, would be to deprive them of the exercise of their own judgments in the performance of the duty imposed upon them. They are to assess the damages, not the court. It is true, that before the company can be called upon for payment, or

[Sunbury and Erie Railroad Company *v.* Hummell.]

the owner of the land have judgment and execution, the report must be confirmed by the court. What facts have been brought to the knowledge of the court, to justify them in withholding their assent to the confirmation of the report? No proof has been adduced by the company, and the depositions taken on behalf of the petitioner are corroborative of the action and judgment of the viewers. These remarks dispose of the exception that consequential damages could not be awarded by the viewers; and also the first exception that $100 per acre for the land, stated in the report to be second rate, is extravagant.

"The second and fourth errors may be considered together.

"The viewers have set out in their report, the quantity and quality of the land occupied by the road: these are the only matters required by the act to be specially enumerated. If the objection be valid that the number of panels of fence should be specified, would it not be necessary that the property that may be destroyed should be stated? The whole amount of damages awarded is set out, and the court are of opinion the finding is sufficiently certain.

"The rule to show cause is discharged, and the court direct judgment to be entered on the report of viewers for the sum of $1687.12½, with interest from the 5th of November, 1855, with legal costs; and if the amount is not paid within thirty days after the entry of such judgment, execution may then issue thereon."

The errors assigned were to the court's overruling the exceptions to the report, the confirmation of the same, and entering judgment thereon for the damages as assessed by the viewers.

*Armstrong* and *Maynard*, for plaintiff in error.—The assessment of $1000 for damages that may hereafter be done to the building by fire communicated from locomotives cannot be sustained. The barn is not yet burned, and never may be. The court was governed by The Reading Railroad Co. *v.* Yeiser, 8 *Barr* 366. By the language of the Act of 4th April, 1833, upon which that decision was based, the viewers were to find for "all inconveniences which may be likely to result." There is no such provision in the act under which this report was made. In that case the fire had already occurred, and the plaintiff declared for negligence. This report excludes burning from negligence, and if it should be burned, and he could prove *negligence* as against the company, he would recover for it again. But they are not answerable for anything but that in the use of their road, and should not be made to pay for the legal and proper use of their own property: 2 *Roll. Abr.* 605; 1 *Sid.* 167; Clark *v.* Foot, 8 *John.* 421; Livingston *v.* Adams *et al.* 8 *Conn. R.* 175; Panton

v. Holland, 17 *John.* 62; Thurston v. Hancock, 12 *Mass. Rep.* 220.

Consequential damages are not to be estimated unless provided for in the act of incorporation: Reitenbaugh v. Chester Valley Railroad, 9 *Harris* 101; 6 *Barr* 382; Henry v. Pittsburgh and All. Bridge Company, 6 *W. & Ser.* 100.

The company is liable for fires caused by carelessness: Haight v. Philadelphia and Reading Railroad, 11 *Harris* 373. There is therefore no reason for giving damages in advance.

The plaintiff has not set out in his petition any claim for prospective and consequential damage: Union Canal Company v. O'Brien, 4 *Rawle* 358.

It is submitted that it will be safer to assess damages for loss by fire after rather than before the burning takes place, as a party may have received his damage and parted with his title to another before the injury accrues.

*Miller*, for defendant in error.—The 12th section of the act incorporating the Pennsylvania Railroad Company is substantially the same as the law under which this assessment was made. And the decisions under that law fully sustain the ruling in this case: Pennsylvania Railroad Company v. Heister, 8 *Barr* 457; Mifflin v. The Railroad Company, 4 *Harris* 193; Philadelphia and Reading Railroad v. Yeiser, 8 *Barr* 366. This last case decides that no recovery can be had in an action for damages done by sparks from locomotives, unless upon proof of negligence. The *risk* therefore of having the plaintiff's buildings consumed by the ordinary use of the road was a fair subject of compensation.

The opinion of the court was delivered by

Lowrie, J.—Railroad companies are liable at common law for the damages done by fire, occasioned by the negligent management of their locomotive engines; and therefore it is plain that for the risk of such damage, no compensation can be allowed at the taking of the land for the construction of the road: 23 *State Rep.* 373. Must they make compensation, in advance, for the risk of fires not covered by this rule?

The charter of this company does not expressly say that they must; and therefore we must inquire what may reasonably be presumed to have been the intention of the legislature when they granted the charter. To aid us in this, it is proper to refer to what the legislature have usually done in such cases. In no charter that we know of, have they ever in terms provided for such compensation; and the state did not allow it when it constructed the railroads from Philadelphia to Columbia, and from Hollidaysburg to Johnstown. And in making the state canals, and authorizing other navigation improvements, the corresponding

risk of dams giving way without negligence, has in no instance been declared to be a subject of preliminary compensation. And yet no one can examine our laws providing for public improvements by the state or by companies, by means of canals, railroads, plank-roads, turnpike-roads, and slackwater, without seeing that in such cases the legislature have, in almost every instance, intended to provide compensation for every injury that is usually recognised as such by the common law, if committed by a private individual. An oversight in this regard in the charter of the Monongahela Navigation Company was corrected by statute. Such has been our legislative practice.

How do we find the judicial practice here and elsewhere? As a general rule, no otherwise. The courts have regarded the special remedies provided in such cases as intended to cover all common law injuries and no more, unless the contrary appears: 4 *Rawle* 23; 16 *State Rep.* 193; 19 *Id.* 15; 2 *Watts* 418; 6 *Mees. & W.* 705. But this does not include remote, contingent, and speculative damages, which are not susceptible of definition or proximately chargeable to the work done: as by changing the use of a street, by laying a railroad track upon it: 6 *Whart.* 45; or if the damage depends on accidental circumstances existing at the time: *Id.* 115; or for profits which might have been made: 7 *Ser. & R.* 422; 5 *A. & E.* 163; or for affecting a public right of fishing: 14 *Ser. & R.* 83; or such like cases: 8 *State Rep.* 56; 17 *Pick.* 284.

And such is in fact the principle of the Monongahela Navigation Company *v.* Coon, 6 *W. & Ser.* 101; not that consequential damages are not recoverable in such cases unless expressly provided for; but that the damage sued for was not an injury at common law. It decides that, if one has a mill-dam in a navigable river, constructed under a general privilege granted by law, with the condition of not obstructing the navigation; he has no remedy against a company authorized to improve the navigation by dams and locks, for injuring his mill-power by raising the water in the river by their dams, unless a remedy be expressly given. And a principal reason for this appears in the argument of the learned Chief Justice (pp. 112–114) to show that such a privilege is revocable, and therefore the act complained of is no injury at law. Grant that there is nothing in the Constitution that demands that the legislature should provide for consequential damages, still justice requires it, and it is always done, both for state and company improvements, unless omitted by mistake; for it is not for the purpose of assuring to improvement companies any part of the state's immunity from action, but from the necessity of the case, that special tribunals and modes of trial are provided for such cases.

Many cases show that the compensation clauses are entitled to

a liberal construction as remedies for damages sustained. Thus, under the clause, "interfering in any way with rights of property,". damages were allowed against the state for injuring a mill-power in a branch stream : 2 *Watts* 418. Under a clause for land "damaged or injuriously affected," damages were allowed against a company for lowering a road on which the complainant's land abutted : 2 *Queen's Bench Rep.* 347 ; and for obstruction of lights and annoyance by dust and dirt blown from an embankment : 10 *Mees. & W.* 425 ; and for affecting the access to a wharf by passing between it and low water mark without touching it : 6 *Id.* 699.

And when viewers are required to take into consideration the advantages and disadvantages resulting from an improvement, they are authorized to enter in some measure upon speculative and contingent estimates, unless these advantages consist simply of the conveniences of the road to the owner of the land ; and these disadvantages, the inconveniences arising from the mode in which the improvement cuts through his land ; and then they would not be speculative or contingent, though the measure of them in many instances might be very difficult. In an English case, Lee *v.* Milnor, 2 *Mees. & W.* 824, under a clause authorizing compensation for "future temporary or perpetual continuance of recurring damages," it was held that no contingent or imaginary damages, which may never occur at all, could be allowed, and that the cause of the injury that could justify any, must exist in some work of the company from which an injury is certain to accrue, and which furnishes the elements of a calculation.

In the charter of this company the compensation to be allowed is "for the damage done or likely to be done," or for the damages that "have been or may be sustained," taking also into account "the advantages and disadvantages," and we cannot doubt that the compensation intended is to be sufficient to cover all the damage actually sustained by the construction of the road, whether direct or consequential, and without the shield of the state's immunity from action as against any part of it.

The law, therefore, provides for the future : "damages likely to be done." But this is susceptible of a very obvious explanation, and that is, that the law was providing for an assessment of damages before the work should be constructed ; and therefore this form of expression was necessary in providing for any damage, direct or consequential ; and it does not necessarily imply damage that is speculative and imaginary. And besides it is a very proper mode of including those permanent and continuing inconveniences that are always apt to follow such improvements, arising from embankments, deep cuts, obstructions of roads, &c.

Is it reasonable to infer that remote and contingent future damage, such as accidental fire from locomotives, was intended to

be estimated and paid for? We think it is not. We find no Act of Assembly that indicates that such a thing was ever thought of. The legislature never had anything like it in its mind when providing for public improvements. The law proclaims its general rule, that it has no remedy for merely accidental injuries; and when providing for the construction of internal improvements, it has uttered no new one. It has given no compensation for the risk of bridges burning or falling, lock or toll-houses taking and communicating fire, stationary engines exploding, locomotives running off the track into a man's house, dams and locks giving way and inundating his land, or anything of that kind.

And why should it? If it takes a man's land or injuriously affects his property by the improvement, it gives him full compensation according to the best estimate that it is competent to obtain; and why should he have more? True, his risks may be increased by the improvements; but so is it with every man along the road, even though his land be passed without touching it, and why should one be paid. for the risk and the other not? In going along streets, the locomotives may pass under the very eaves of a thousand houses without paying in advance for the risk. The improvement increases the risk; but so does improvement by the erection of mansions, and especially of all sorts of steam works, but no one gets compensation for such risks.

It is a simple law of nature, that he who lives in society must take the risk of those social accidents which society knows not how to prevent. The incidental hazards must stand as balanced by the incidental benefit of the social state.

It is also relevant to this question of reasonableness to ask how the risk is to be measured? There may be but a single shanty on the land of the claimant, and if we are to provide for future risks, the duty is not satisfied by merely ascertaining the risk of the shanty, for there may yet be a hundred houses there: how can it be told how many, or of what kind or value? And who can calculate the chances of accidental fire? We know not yet the kind of fuel that may be used; nor the improvements to be made for preventing the emission of sparks; nor how soon there will be another element than fire and steam for locomotive power, nor whether there will be one or one hundred locomotives daily along the road.

These considerations show that an estimate of such a risk for all future time, can be founded on no rational principles, and can be formed only by an average of unintelligent guesses. The present case is an illustration of their uncertainty; for the risk of this barn is estimated at half its value, when most likely it could be shown by experience that not one erection in a thousand along a railroad is burnt in a year. If all houses near to the

[Sunbury and Erie Railroad Company v. Hummell.]

track of proposed railroads had to be paid for at this rate, no railroads could be made.

It is unreasonable to ask intelligent men to make a sworn estimate of a mere risk, which can be founded on no present data, but only on an imaginary state of things, which may never exist, or which may come complicated with other things which may totally change their character; and we are convinced that this law does not intend such an estimate.

We have said nothing as yet of the Railroad v. Yeiser, 8 *State Rep.* 366, though it is it that has occasioned much of this discussion. We desire to leave that case as little affected by the point here decided as possible; for it does not stand on the very same ground, since, there, the road was to be made before the damages were assessed, and yet there were to be damages for inconveniences "likely to result." But still we may be indulged in saying that it seems to us that the point for which that is cited did not arise there. That was an action for negligence, and the learned President of the Common Pleas held that, if the railroad company caused the accident, they must disprove negligence, and for this the judgment was reversed, though the principle seems to be sustained by the opinion of GIBSON, C. J., in another case: 4 *Rawle* 25. We cannot see how, in such a case, the question which we have here discussed could be raised, and therefore it seems to us that thus far it contains an irrelevant expression of opinion by a single judge.

From what we have said, it results that this judgment must be reversed so far as relates to the $1000 allowed for damages that may be done by accidental fire, and affirmed as to the residue.

> Judgment reversed, so far as it confirms that part of the report of the viewers, which awards $1000 for damages that may be done to the buildings from fires, and affirmed for the residue, to wit, for the sum of $687.12½, with interest from May 5, 1856, and costs.

LEWIS, C. J., and BLACK, J., dissented.